IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
June 12, 2012 Session

## JAMES PATRICK STOUT v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. M26091    Walter C. Kurtz, Senior Judge**

_____

**No. W2011-00277-CCA-R3-PD  - Filed August 23, 2012**

_____

The Petitioner, James Patrick Stout, was convicted of felony murder, especially aggravated kidnapping, and especially aggravated robbery.  At the sentencing hearing for the felony murder conviction, the jury found three aggravating circumstances: (1) the defendant was previously convicted of one or more felonies whose statutory elements involved the use of violence to the person; (2) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; and (3) the murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any robbery or kidnapping. T.C.A. § 39-13-204(1)(2), (6) (Supp. 1995).  The jury also found that the evidence of these aggravating circumstances outweighed evidence of the mitigating circumstances beyond a reasonable doubt and imposed a sentence of death for the Petitioner's felony murder conviction.  In a separate sentencing hearing, the trial court sentenced the Petitioner to forty years for each of his convictions for especially aggravated robbery and especially aggravated kidnapping, to be served consecutively to one another and consecutively to the death sentence.  On direct appeal, the Tennessee Supreme Court affirmed the Petitioner's convictions and sentences. *See State v. Stout*, 46 S.W.3d 689 (Tenn. 2001).  The Petitioner filed a pro se petition for post-conviction relief, which was later amended by appointed counsel.  Following an evidentiary hearing, the post-conviction court entered an order in which it denied the Petitioner post-conviction relief from each of his three convictions and his sentences for the convictions of especially aggravated robbery and especially aggravated kidnapping.  The post-conviction court's order granted the Petitioner post-conviction relief from his sentence of death, ordering that the Petitioner have a new sentencing hearing.  The Petitioner appeals the post-conviction court's order denying relief regarding the guilt phase of trial.  After a thorough review of the record and applicable authorities, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JEFFREY S. BIVINS and ROGER A. PAGE, JJ., joined.

Bradley A. MacLean and Avram D. Frey, Nashville, Tennessee, for the appellant, James Patrick Stout.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Amy P. Weirich, District Attorney General; and John W. Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts
### A. Trial

The Tennessee Supreme Court summarized the evidence presented at trial as follows:

On November 8, 1995, the [Petitioner] and three co-defendants, Derrick Carmichael, Robert Terrell, and Quentin Jordan, were at the apartment of Tonya Woodall in Memphis, Tennessee. Jordan testified that the four men left Woodall's apartment in a blue Corsica driven by Terrell. The [Petitioner], who was in the front passenger seat, saw the victim driving her car and said that he "was going to get this whore." The four men followed the victim for five or ten minutes and then pulled behind her car as she parked in front of her house.

According to Jordan, the [Petitioner] got out of the car, grabbed the victim by her hair, put a gun to her stomach, and forced her into the backseat of her car. The [Petitioner] got in the driver's seat of the victim's car while Jordan got in the backseat with the victim. The [Petitioner] handed the gun to Jordan. Jordan testified that the [Petitioner] asked the victim if she believed in God. When the victim said that she did, the [Petitioner] said, "Well, you're with the devil now." When Jordan addressed the [Petitioner] by name at one point, the [Petitioner] replied that the victim would have to be killed because she knew his name and had seen his face. The [Petitioner] stopped the victim's car near some railroad tracks, took the gun back from Jordan, got out of the car, and pulled the victim from the rear seat. According to Jordan, the [Petitioner] asked the victim if she "wanted to hug a real man before she died." The [Petitioner] embraced the victim; then he stepped back and shot her once in the head. After taking a suitcase from the victim's car and trying to wipe off

any fingerprints, the [Petitioner] and Jordan left the scene with Terrell and Carmichael.

Like Jordan, Derrick Carmichael testified that he, the [Petitioner], Jordan, and Terrell left Tonya Woodall's apartment in a blue Corsica. The [Petitioner] spotted the victim driving her car, instructed Terrell to follow the car, and said he was going to "rob" the victim. When the victim parked in front of her house, the [Petitioner] and Jordan got out of the car and approached her. The [Petitioner], who was armed with a gun, grabbed the victim before she made it to her house. The [Petitioner] gave the gun to Jordan, who got in the backseat of the victim's car with the victim. The [Petitioner] drove the victim's car and Terrell and Carmichael followed them. According to Carmichael, the [Petitioner] parked near some railroad tracks and got out of the car with the victim and Jordan. The [Petitioner] hugged the victim and then shot her. The [Petitioner] and Jordan got back in the Corsica and the four men left the scene.

Robert Terrell's testimony was similar to that of Jordan and Carmichael. He testified that as they left Tonya Woodall's apartment, the [Petitioner] was checking a small pistol for bullets and said they "were going to make a sting." The [Petitioner] tried to get Terrell to follow several cars, but Terrell refused. Terrell testified that the [Petitioner] told him to park the car while he went to his aunt's house; when Terrell stopped the car, the [Petitioner] and Jordan got out. Terrell testified that he then saw the [Petitioner] and Jordan driving toward him in a red car, and he followed. When the [Petitioner] stopped the car, Terrell saw Jordan and the victim get out of the backseat. Terrell testified that the [Petitioner] hugged the victim and then shot her once in the head. The [Petitioner] and Jordan returned to the car Terrell was driving with some of the victim's property. Terrell drove the [Petitioner] and Jordan back to Woodall's apartment and also saw them at the apartment the next night. According to Terrell, Jordan was upset, crying, and cursing the [Petitioner]. The [Petitioner] said, "Well, she heard my name, so I had to kill her."

Tonya Woodall testified that the [Petitioner], Jordan, Carmichael, and Terrell were together at her apartment on November 8, 1995. On the following day, she saw Jordan, who looked "depressed" and "upset." Jordan initially would not tell Woodall what was wrong, but finally told her that the [Petitioner] had killed a woman. Woodall later heard Jordan confronting the [Petitioner], but she did not hear the [Petitioner] make a response. Woodall

testified that the police threatened to charge her as an accessory to the offense unless she made a statement. She also testified that the [Petitioner] had threatened her and her family if she testified.

The [Petitioner] gave a statement to police that varied markedly from the above testimony of Jordan, Carmichael, and Terrell. The [Petitioner] said that he, Jordan, and two others - Vassy Gandy and Rico Bowers - were at Tonya Woodall's apartment on the night in question. When they left, they rode around in a white Mustang with Gandy driving and the [Petitioner] in the backseat. Bowers, who was armed with a pistol, told Gandy to follow the victim's car. When the victim's car stopped, Bowers got out and grabbed the victim by her hair and forced her into the backseat of her car with Jordan. According to the [Petitioner]'s statement, Bowers drove the victim's car to some railroad tracks and got out of the car with Jordan and the victim. Bowers hugged the victim, backed away about five feet, and fired one shot. Bowers and Jordan searched the victim's car and wiped it down. According to the [Petitioner]'s statement, the four men returned to Woodall's apartment where Jordan and Bowers 'bragged' about what had happened. The [Petitioner] denied knowing that a robbery, car jacking or killing was going to occur.

The victim, Amber Hunter, a total stranger to the [Petitioner], was 26 years old at the time she was killed. She was a college graduate and was employed at a bank. She was returning home from a church service on the night she was killed. The victim sustained a gunshot wound to her head and remained unconscious until her death two days later on November 10, 1995.

After hearing the evidence and deliberating, the jury found the [Petitioner] guilty of felony murder for the killing of the victim in the perpetration of a robbery, especially aggravated kidnapping, and especially aggravated robbery. The trial then moved into the sentencing phase for the offense of felony murder.

. . . .

In seeking the death penalty for the [Petitioner]'s conviction for felony murder, the prosecution introduced evidence that the [Petitioner] was convicted of especially aggravated robbery in January of 1997. The victim of that offense, Walter Bush, testified during the sentencing phase that he was car-jacked and shot in the head by the [Petitioner] on November 11, 1995. Bush testified that the [Petitioner] had first asked if he knew the [Petitioner]

-4-

or would recognize him and that when Bush said no, the [Petitioner] told him to walk away. When Bush had walked three or four feet, the [Petitioner] shot him. Bush admitted that two other men had been with the [Petitioner] and that two of the men had guns. Bush nonetheless testified that the [Petitioner] was the person who shot him.

The [Petitioner] presented several witnesses in mitigation. The [Petitioner]'s mother, Annette Bailey, testified that she was an exotic dancer and prostitute at the time she became pregnant with the [Petitioner] and that she used cocaine during the pregnancy. When the [Petitioner] was three weeks old, Bailey gave him to her mother, Francis Beasley, who later obtained custody. Bailey testified that she rarely saw the [Petitioner] and felt that his problems were her fault. She said that the [Petitioner]'s father knew about the trial, but would not appear on behalf of the [Petitioner].

Francis Beasley testified that she had six children, including the [Petitioner]'s mother, and that she raised the [Petitioner] as "one of her own." All of her children, except the [Petitioner]'s mother, helped to raise the [Petitioner] and engaged in family activities. Beasley took the [Petitioner] to church every Sunday, and the [Petitioner] continued to be an active member of the church up until the time of his arrest. The [Petitioner] had treated her with love and respect and had been very close to Beasley's husband before his death in 1991. Beasley testified that when the [Petitioner] was 16 or 17, he was "devastated" when his mother told him she wished he had never been born. Beasley asked the jury to spare the [Petitioner]'s life.

Sheronda Bond testified that she was the [Petitioner]'s fiancee and that she and the [Petitioner] had a child together. Their child, as well as the [Petitioner]'s older child through another relationship, visited the [Petitioner] in prison. According to Bond, the [Petitioner] shows love and concern for the children. She asked the jury to spare the [Petitioner]'s life.

Other family members testified on the [Petitioner]'s behalf. Thomas Stout, the [Petitioner]'s grand-uncle, testified that he was the Pastor in the church attended by the [Petitioner]. He visited the [Petitioner] in prison, where they discussed scripture and read the Bible. Teresa Stout, the [Petitioner]'s aunt, testified that she had been close to the [Petitioner] his entire life and that the [Petitioner] was "devastated" when his grandfather passed away in 1991. She asked the jury to spare the [Petitioner]'s life.

Randall Stout, the [Petitioner]'s uncle, testified that he went to church with the [Petitioner] and taught him how to play musical instruments with the church choir. He testified that the [Petitioner] was not a "villain" and had been a nice child. He testified that the [Petitioner] had continued his involvement in the church and was a "changed person." On cross-examination, Stout acknowledged that the [Petitioner] was involved with a gang called the "[G]angster [D]isciples." Stout was also aware of the [Petitioner]'s prior convictions for aggravated burglary, theft, reckless endangerment, and the especially aggravated robbery of Walter Bush. Stout nonetheless said that the charges against the [Petitioner] had been "trumped up."

Makimba Fowler testified that he was in jail with the [Petitioner] in June of 1993. Both men were members of a gang called the [G]angster [D]isciples, which had a large number of members in the jail. Fowler testified that the [Petitioner] was expelled from the gang when he was beaten by other gang members and stabbed with an ink pen. Donald Justus, a prison jailor, testified that he saw the [Petitioner] in June of 1993 with a "bruised eye and stuff." Justus testified that prisoners who were not gang members were often in danger from gang members.

*Stout*, 46 S.W.3d at 693-96.

### B. Post-Conviction Hearing

At the Petitioner's hearing on his petition for post conviction relief, the following relevant evidence was presented:[1] The Petitioner's lead counsel ("Counsel") testified that the Petitioner's trial for shooting Walter Bush occurred on January 6 and 7, 1997, and a different attorney represented the Petitioner during this trial. Following the Bush trial, the Petitioner's family contacted Counsel. On January 30, 1997, Counsel entered into a contract of employment with Randle Stout, the Petitioner's uncle, whereby Counsel would represent the Petitioner in the appeal of the Bush trial for $3,500 and in this murder case for $21,500. Mr. Stout initially paid Counsel $3,800. According to the contract, Counsel would formally undertake representation of the Petitioner upon payment of an additional $6,200.

---

[1]Ultimately, the post-conviction court granted the Petitioner's request for post-conviction relief for his sentence of death, and the State does not appeal that judgment. The issues before this Court on appeal are whether the post-conviction court erred when it denied the Petitioner post-conviction relief from his three convictions and also from his sentences for aggravated kidnapping and especially aggravated robbery.

Counsel did not recall how long he met with Mr. Stout or whether they discussed the tasks that he would be required to complete in representing the Petitioner. He said he likely did not review the court file before entering into the contract, and he did not recall whether he met with the Petitioner before agreeing to represent him. Counsel stated they later decided to dismiss the appeal in the Bush case in lieu of seeking post-conviction relief in that case. The employment contract was amended so that the $3,500 reserved for the direct appeal was applied to the representation in the post-conviction matter. Another attorney in Counsel's office represented the Petitioner in the Bush post-conviction case.

Counsel said that in 1997 and 1998, he was in court on almost a daily basis. In 1997, he represented Rodney McDougal and Roderick Cobb in capital trials. He reached an agreement with the State in Cobb's case during the trial in August 1997 after the State had presented its proof. He had one other capital trial scheduled in 1997, but the defendant in that case entered a plea prior to trial. Counsel also represented clients in two capital post-conviction cases during that time period. He did not recall whether these hearings occurred in 1997.

Counsel recalled that the trial court appointed Co-Counsel on April 15, 1997, after Counsel had begun his formal representation of the Petitioner in the murder case. Co-Counsel, who had only been practicing law for a short period of time, acted as both an attorney and as an investigator, working with Inquisitor, Inc., an investigation firm in Memphis. Counsel had met Co-Counsel through Ron Lax, another investigator with Inquisitor, and he had worked with Co-Counsel while representing Cobb. Counsel recalled that Co-Counsel's courtroom experience was limited but said that she had examined witnesses in a capital trial in Clarksville, Tennessee, that involved multiple homicides.

Counsel acknowledged Tennessee Supreme Court Rule 13 was amended, effective July 1997, to provide for qualifications that an attorney must meet in order to represent defendants in capital cases. He did not recall filing additional motions to qualify Co-Counsel after the rule was amended. He said he and Co-Counsel discussed whether she met the qualifications under the amendment to Rule 13 and concluded that she was qualified to represent the Petitioner as co-counsel based upon her experience with the capital case in Clarksville.

Counsel said that Co-Counsel's role was to prepare the case and perform the "detail work" and that his role was to be the "presenter." They collaborated regarding possible defenses and used Inquisitor to conduct the investigation. Because Co-Counsel was employed with Inquisitor, she had access to all of the company files.

Counsel testified that on June 13, 1997, he filed a motion asking that the State declare

its intention to seek the death penalty. The State entered its notice on June 19, 1997. He also filed a motion to suppress the Petitioner's statement to police and an amended motion to suppress. Counsel said the motion to suppress was part of a packet of motions that he filed in almost every case and was not tailored to the specific facts of the Petitioner's case. He explained that local rules required motions be filed within twenty or twenty-five days and that in many cases, he had not received discovery from the State during that time period. His practice was to file a packet of motions during that time period and later file amended and supplemental pleadings. Counsel could not recall whether a deadline was approaching in the Petitioner's case when he filed the motions in June 1997.

On June 13, 1997, Counsel also filed a motion for an ex parte hearing to request defense services. He generally tried to involve an investigator as early in the case as possible. He did not recall requesting funds for an investigator before June 1997 and did not recall why he waited until June to file the motion for the ex parte hearing. Counsel acknowledged that, when he filed the motions in June 1997, he was extremely busy preparing for Cobb's trial in addition to his normal caseload. He said he did not file a motion requesting funds to retain an investigator, mitigation specialist, and mental health professional in June 1997. Rather, the motion was filed and signed by Co-Counsel on November 4, 1997, and the trial court entered an order authorizing the funds on the same day. The order authorized funds to retain Ron Lax with Inquisitor as the investigator, Glori Shettles, also with Inquisitor, as the mitigation specialist, and Dr. Pamela Auble as the mental health professional. Dr. Auble was retained to evaluate the Petitioner for purposes of obtaining mitigating evidence for the penalty phase. Counsel's observations of the Petitioner did not indicate competency was at issue.

Counsel testified that, when the motion for authorization for funds was filed in November 1997, the Petitioner's trial was scheduled for January 12, 1998. He knew of no reason why funds were not requested prior to November 1997 "other than schedule." He had no independent recollection of the nature of the work that he and Co-Counsel performed on the case from June 1997 to October 1997.

Counsel testified that the petition for post-conviction relief regarding the Bush case was filed on the Petitioner's behalf on November 6, 1997. He hoped he could rely upon the petition as grounds for a continuance in the murder trial. He filed a motion to continue the murder trial on December 19, 1997, and attached a copy of the post-conviction relief petition for the Bush case. Counsel said the hearing on the motion to continue was held on the same day that the motion was filed. He informed the trial court that Investigator Lax had been appointed as an investigator in a federal death penalty case and a capital murder case in Nashville involving serial murders. Counsel believed he had confirmed the availability of Investigator Lax and Ms. Shettles before retaining them for the Petitioner's case. He

informed the trial court that he had tried two capital cases and two capital post-conviction cases since February 1997. He also told the trial court that he had not prepared the Petitioner's case for trial because he was busy preparing other capital cases and had expected to reach a plea agreement with the State on the Petitioner's case.

Counsel did not recall the State indicating any willingness to consider a plea agreement before the notice of its intention to seek the death penalty was filed. The State never offered a settlement and did not express a willingness to discuss a settlement. Counsel stated the fact that the prosecutor had never made an offer to the Petitioner did not mean that he did not believe they could reach a plea agreement. He acknowledged that, by December 1997, he realized he was not prepared to try the Petitioner's case in January 1998 because he needed to perform additional tasks, Lax and Shettles needed additional time to investigate, and Dr. Auble needed additional information to render an opinion. The trial court initially denied the motion to continue the trial but later continued the trial from January 12, 1998, to February 23, 1998. Counsel did not recall the circumstances under which the trial was later continued.

Counsel said the Petitioner's trial began on February 23, 1998, and concluded on March 3, 1998. Counsel had a sinus infection when the trial began and requested an adjournment of the trial, filing a formal motion on February 25, 1998. He believed his illness "detracted from [his] ability to be sharp." When the trial judge stated Co-Counsel could conduct voir dire, Counsel responded that he was assigned the task of conducting voir dire and that Co-Counsel was not qualified to conduct voir dire.

Counsel testified that, at the trial, the State primarily relied upon the testimony of the co-defendants. Verico Bowers and Vasie Gandy originally told the police that they, along with Quentin Jordan and the Petitioner, participated in the robbery and homicide. At trial, the State presented evidence that Robert Terrell and Derrick Carmichael, and not Bowers and Gandy, were with Jordan and the Petitioner. Both Terrell and Carmichael, along with Jordan and Woodall, testified at the Petitioner's trial. Counsel said the statements given by Bowers and Gandy contradicted the State's theory at trial. He acknowledged the officer who took the initial statements of Bowers and Gandy stated in his report that they "provided numerous details that only parties responsible could have known."

Counsel said one of the defenses at the guilt phase involved portraying Bowers and Gandy as ranking members of the Gangster Disciples. The Petitioner was a former member of the Gangster Disciples but was "beaten out" of the gang while in jail on a prior conviction in 1993. Counsel planned to argue that Bowers and Gandy decided to identify the Petitioner as the shooter because he was a "neutron" or "throwaway." According to this defense theory, to avoid jail, Bowers and Gandy also had ordered Terrell and Carmichael, two lower-ranking

members of the Gangster Disciples, to "replace" them as participants in the offense. Counsel said he planned to present three witnesses to support this theory: Chaplain Carl Nelson, a gang expert; Sergeant D.M. Justus, an officer at the jail who wrote the incident report in 1993 regarding the beating of the Petitioner; and Makimba Fowler, an inmate at the jail in 1993.

Counsel testified that, when he attempted to present the defense theory in his opening statement, the trial court stopped him. The State objected when he attempted to introduce the incident report from 1993. The trial court did not permit Counsel to question Sergeant Hightower on cross-examination about a statement in Hightower's report that Bowers and Gandy provided details about Hunter's homicide that only someone who was present would have known. Counsel raised the issue on appeal, and the Tennessee Supreme Court held that the trial court erred but that the error was harmless. Counsel did not recall whether the statements of Bowers, Gandy, Terrell, and Carmichael were in the appellate record. The appellate record was supplemented to include the statement in Sergeant Hightower's report that Gandy and Bowers provided details that only someone who was present at the homicide would have known.

Counsel said that he believed that when Fowler, who was incarcerated with the Petitioner in 1993, was initially interviewed by an investigator with Inquisitor, he recalled the incident in 1993 but could not identify the Petitioner as the victim. Once Fowler saw the Petitioner when he was called to testify in a jury out hearing during the penalty phase, he recognized the Petitioner and recalled the incident. Counsel admitted he was surprised by Fowler's testimony, in part because he had never spoken to Fowler himself. Counsel identified a letter dated February 19, 1998, from Inquisitor to Riverbend Maximum Security Institute, where Fowler was incarcerated, requesting the opportunity to meet with Fowler on February 20, 1998. He believed they had just learned of Fowler when the letter was sent. He acknowledged the incident report about the Petitioner's 1993 beating listed the names of the inmates in the pod, including Fowler. Counsel also identified a memorandum from Investigator Lax, stating he had served Fowler with a subpoena on February 20, 1998. Counsel was unable to locate any memoranda reflecting any interviews or additional information that the investigator may have received from Fowler. Fowler had since passed away at the time of the post-conviction hearing.

Counsel said that although he filed a motion to suppress the Petitioner's statement to the police, he did not pursue the motion. He did not consider the accessory corroboration defense before the trial but raised the issue on direct appeal. The Tennessee Supreme Court rejected the claim, holding that the Petitioner's statement in which he admitted he was present at the scene of the homicide and Woodall's testimony that she had been threatened were sufficient to corroborate the testimony of the co-defendants. Counsel acknowledged that the Petitioner gave his statements about the Bush shooting at the same time that he gave

his statement about Hunter's murder. He agreed that he, as the attorney representing the Petitioner on his post-conviction petition from the Bush shooting, argued that the trial counsel at the Bush trial was ineffective for failing to suppress the Petitioner's statement to police.

Counsel said the State presented Woodall's testimony about the statements Jordan made to Woodall about the victim's death. Based on this testimony, Counsel questioned Woodall about whether police officers had threatened to charge her as an accessory before she gave her statement. On redirect examination, the State questioned Woodall about threats that she had received from the Petitioner if she testified at trial. Counsel objected to the questioning, but the trial court found that Counsel had opened the door to such testimony. Counsel did not cross-examine Woodall about the basis of her knowledge of the source of the threats that she had received. He identified a memorandum from Investigator Lax that stated that, during his interview with Woodall on December 20, 1997, Woodall said that she had been threatened. The report further indicated that, although the threats were from the Petitioner, he did not threaten her directly. Counsel acknowledged that the memorandum indicated that Woodall's testimony about the threats was hearsay and lacked foundation. He conceded that he did not object to the testimony at trial based upon these grounds. Woodall had passed away at the time of the post-conviction hearing.

Counsel testified that, during his cross-examination of Sergeant Hightower, he attempted to enter into evidence photographs of a shoeprint in the victim's car, but the State objected based upon authentication. Counsel said that he assumed Investigator Lax could have determined which police officer took the photographs, but conceded that he never asked Investigator Lax to do so. Counsel recalled that the State had provided the defense a list of witnesses but had not provided the subject of each witness's testimony. W.L. Horsley, the police officer who took the photographs, was included on the witness list and was subpoenaed by the defense for trial.

Counsel testified that Tony Carruthers, his former client, claimed that he heard Terrell make a statement that contradicted Terrell's testimony. Counsel had the Petitioner sign a statement disclosing the possible conflict of interest and providing that Counsel did not believe it would be in the Petitioner's best interest to call Carruthers as a witness at trial. Co-Counsel had issued a subpoena for Carruthers on February 13, 1998. Counsel was unaware of whether the disclosure was signed by the Petitioner before or after the subpoena was issued. Counsel acknowledged that the statement, signed by the Petitioner, did not include language waiving the conflict, and Counsel did not recall addressing the trial court regarding the issue.

Counsel testified that, prior to deliberations in the guilt phase, a juror passed a note

-11-

to the trial court that stated, "I would like to know, have you changed his life to Christ, or how is his behavior in prison." The trial court did not read this question to the jury and, instead, reread a portion of the jury instructions to the jury. Counsel said he did not raise an objection regarding the note.

On cross-examination, Counsel testified that he relied upon Co-Counsel to prepare the case for trial and that his role was to present the case to the jury. He said he had worked with Co-Counsel in Cobb's case and was pleased with her work. Although Counsel did not believe that Co-Counsel had previously conducted voir dire in a case, he said voir dire was one of the tasks for which he was responsible at trial. Counsel prepared the cross-examinations of the State's witnesses based upon the discovery provided by the State and the information obtained from the investigators. He crafted the defense based upon that information as well as interviews with the Petitioner and his statement to police.

Counsel testified that he had the statements of the co-defendants and knew they would testify that the Petitioner orchestrated the carjacking of Hunter and shot her. The defense team developed a defense theory to challenge their statements. The defense team interviewed Chaplain Nelsen, who stated that the Gangster Disciples employed a method called "substitution," where young gang members will accept the blame for crimes committed by ranking members. Counsel said their defense theory was that Bowers and Gandy committed the offenses, but "substituted" Terrell and Carmichael as participants, and blamed the Petitioner for the offenses.

Counsel said he intended to call Gandy and Bowers as witnesses in the guilt phase. Ultimately, he did not do so because the trial court ruled that, if they testified, the State could question them about the Bush shooting, for which they had also been indicted as the Petitioner's co-defendants. Counsel believed that if the facts of the Bush case were presented "it would be very bad" and would detract from their defense theory. Instead, Counsel cross-examined each co-defendant about the discrepancies in their statements and about potential deals and consideration that they might receive for testifying against the Petitioner.

Counsel testified that the Petitioner admitted to the police that he was present when the shooting occurred but denied being the one who had shot Hunter. Counsel explained that he made a tactical decision to not pursue the motion to suppress because the statement supported their theory of defense and allowed them to present the Petitioner's version of the events without him having to testify. Counsel used the statement to argue that the Petitioner was merely present at the shooting and that the co-defendants were attempting to divert the blame.

Counsel said Co-Counsel and the investigators informed him about what they

anticipated the testimony of Fowler, the inmate who recalled the jail beating, would be at trial. He was warned that Fowler recalled an incident but did not specifically recall the Petitioner or whether the incident that he recalled involved the Petitioner. Fowler was not shown a photograph of the Petitioner before his testimony. Once Fowler saw the Petitioner during the penalty phase, he recognized him.

Counsel recalled that Investigator Lax interviewed Woodall before the trial and that the defense also possessed her police statement. Woodall testified at trial that the Petitioner and Jordan were at her apartment, then left, and later returned. Woodall further testified about her conversation with Jordan about the shooting. Counsel was unsure whether Investigator Lax interviewed all of the police officers, as they generally refused to cooperate. The remaining lay witnesses were either interviewed by Investigator Lax or the defense team had their statements to the police.

Counsel testified that he generally relied upon the investigators to conduct interviews and that he did not interview witnesses personally. He explained that there was a chance that a witness could offer testimony at trial that differed from the information that the witness provided during the interview. By utilizing an investigator to interview witnesses, he could then call that investigator to testify about the witness's statements during the interview. Counsel explained the reliance on the investigator prevented him from becoming a witness and allowed him to present the investigator's testimony to rebut the witness's untruthful testimony. Counsel met with Investigator Lax on a regular basis to discuss the Petitioner's case. He recalled that Co-Counsel, whose office was located at the offices of Inquisitor, Inc., interacted with the investigators daily.

Counsel said he did not have any concerns about the Petitioner's ability to understand the proceedings or assist him at trial. The Petitioner read cases, discussed them with trial counsel, and understood the cases. Counsel did not believe issues existed regarding the Petitioner's intelligence or competency.

Counsel acknowledged that a potential conflict arose when Carruthers was possibly going to be called as a witness. He said he did not trust Carruthers to testify at trial. The Petitioner was comfortable with the decision to not call Carruthers as a witness. Had the Petitioner expressed a desire to call Carruthers as a witness, Counsel said he would have done so.

Counsel did not recall the prosecution informing him that Officer Horsley photographed a shoeprint found inside Hunter's car. He acknowledged that he attempted to have the shoeprint photograph admitted during his cross-examination of Sergeant Hightower, believing he could prove the shoeprint belonged to someone other than the Petitioner.

-13-

Counsel said he believed that he had laid the proper foundation to admit the photograph of the shoeprint through Sergeant Hightower. The trial court disagreed and refused to admit the photograph into evidence. Counsel explained that the prosecution often did not object to the admission of photographs based upon foundation but that "this was a bitterly-fought case; so, any laxness was not present."

When questioned by the post-conviction court about the photograph of the shoeprint, Counsel explained the photograph was relevant to his argument that someone else committed these offenses. The State did not measure the shoeprint to determine whether it belonged to the Petitioner.

Co-Counsel testified that she graduated from law school in May 1995 and took the Tennessee bar exam in February 1996. In the fall of 1995, before taking the bar, she began working for Inquisitor as a "guilt/innocence" investigator in criminal cases, including capital cases. She continued to work as an investigator while awaiting bar results. She was sworn in as an attorney in August 1996.

Co-Counsel testified that said she was an investigator in the Courtney Matthews case, a capital case involving multiple homicides in Clarksville, Tennessee. Until the beginning of that trial, she was involved strictly as an investigator of the "guilt/innocence" issues. She was, however, sworn in as an attorney during the trial and allowed to examine one or two witnesses during the guilt phase. At the conclusion of that trial, the jury found Matthews guilty of multiple counts of first degree murder, and the jury sentenced Matthews to life in prison.

Co-Counsel testified that she met Counsel through her employment with Inquisitor and worked with him on both Cobb's capital case and the Petitioner's capital case. At that time, she had not appeared in court on any case other than Matthews's case. Co-Counsel recalled that Cobb's trial was in August 1997, and Co-Counsel did not recall conducting an examination of any witness during the trial.

Co-Counsel recalled that she was appointed by the trial court on the Petitioner's case in April 1997, pursuant to Rule 13 of the Tennessee Supreme Court Rules governing indigent defendants. She said she and Counsel had discussed working together again after the Cobb case, which may have been the impetus to her appointment to the Petitioner's case. Co-Counsel agreed that the State filed its motion declaring its intent to seek the death penalty in the Petitioner's case in June of 1997, after she was appointed. She said that, therefore, she was unsure whether she knew at the time of her appointment that the State would seek the death penalty. Co-Counsel acknowledged that on July 1, 1997, Rule 13 of the Tennessee Supreme Court rules was modified to state that, in cases where an indigent defendant was

facing a penalty of death, the court shall designate a public defender, if available, or a private attorney "selected from a panel of attorney[]s approved by the court." Co-Counsel did not recall whether she was a member of the panel of attorneys approved by the trial court when she was appointed to the Petitioner's case. The modified rule also stated that co-counsel in a death penalty case must have had a minimum of twelve hours of specialized training in the defense of defendants charged with a capital offense, in addition to other qualifications. Co-Counsel acknowledged that under Rule 13, as amended, she did not qualify to serve as co-counsel in a capital case.

Co-Counsel described her primary responsibilities in the Petitioner's case as the "logistics of the case—gathering the information, getting it into a form that [Counsel] could then use at trial." She primarily focused on issues relevant to the guilt phase. She said her role in the case was to "collect information in terms of the witness information, meeting with the district attorney's office about evidentiary items, and collecting that information for [Counsel] to then present at trial." Co-Counsel relied upon Counsel to direct her as to the tasks that needed to be completed. Co-Counsel acknowledged she did not have "much" previous experience as an investigator working on capital cases.

Co-Counsel acknowledged that the only hours that she recorded on her time entries for the Petitioner's case between June 27, 1997 and October 6, 1997, were designated as being spent on drafting an investigation-related motion on July 23. She believed she discussed the case with Counsel during that time period but did not specifically recall the discussions. Co-Counsel said that, because she did not note any such discussions on her time entries, the discussions would have been "minimal." Co-Counsel recalled that, during that time period, she was preparing for Cobb's trial. She was unable to explain why they did not seek authorization of funds from the trial court for investigative services until November 1997, but she stated that the delay was likely due to their preparation of Cobb's case.

Co-Counsel testified that she drafted a motion to continue the trial scheduled for January 12, 1998, because she did not believe the defense team had sufficient time to prepare the case for trial. At that time, Dr. Auble, the psychologist hired in this case, needed additional records and had not completed the testing. Also, Investigator Lax was involved in other capital cases and was not fully available to investigate the Petitioner's case; Shettles, another investigator they had hired, was out of town on other capital trials. Co-Counsel said that the trial court eventually continued the trial but that "it didn't get continued for enough time to finish all the things that I was told and that I thought needed to be done." The defense team did not believe the trial would go forward as it was originally scheduled. Co-Counsel said that when they learned that the trial court would not grant any more continuances, "everyone was scrambling to get things accomplished in the time that [they] had." She believed additional tasks should have been completed before the Petitioner's trial.

-15-

Co-Counsel agreed that while she may have known the facts of the case, she did not know how to present those facts due to her lack of experience. At the time of the Petitioner's trial, she did not have any practical experience with procedural and evidentiary issues.

Co-Counsel testified that Officer Horsley had taken a photograph of the victim's car that showed a shoeprint inside the car but that the shoeprint was not preserved. She asked Assistant District Attorney Harris who had taken the photograph during a meeting on December 15, 1997, but, because Sergeant Fitzpatrick was unavailable, he said he would get her that information later. Her notes indicated that, on February 4, 1998, she wrote a memo that indicated that she needed to find out who had taken the photograph from Counsel. Co-Counsel received the State's witness list, which included Officer Horsley as a witness, but she was unsure when she learned that Officer Horsley had taken the photograph. Co-Counsel identified an affidavit from Officer Horsley that included her handwritten notes and explained that the affidavit was prepared to supplement the record following trial. She could not recall why the defense had not called Officer Horsley as a witness at trial. She prepared a witness list that included Carruthers and Officer Horsley. She did not recall when she discussed presenting Carruthers as a witness with Counsel.

Co-Counsel said she contacted Chaplain Nelson, a gang expert, about the Petitioner's tattoos and the meaning of each of them. She met with Nelson on February 11, 1998. Co-Counsel was also present when Ms. Shettles interviewed Frances Beasley, the Petitioner's grandmother.

Co-Counsel testified that on February 18, 1998, she received a note from an investigator stating she had received information that Fowler had participated in beating the Petitioner in the jail. Co-Counsel did not make any effort to schedule an interview with Fowler before February 1998. She received a memorandum from Investigator Lax dated February 20, 1998, which stated that he had served Fowler with a subpoena, but she did not recall reading a memorandum from Inquisitor about Investigator Lax's interview with Fowler. Co-Counsel acknowledged the jail incident report, which included the Petitioner's recount of the beating to Sergeant Justus and listed Fowler and Steven Anderson as inmates who were in the pod when the Petitioner was beaten. Co-Counsel contacted Sergeant Justus but had no information in her file indicating any effort to locate the other inmates listed in the report. When questioned about why the defense team waited until one week before trial to contact the prison about a meeting with Fowler, Co-Counsel explained, "I think it just goes back to the fact that we were working with the limited time and limited resources."

Co-Counsel said voir dire was delayed because Counsel was ill. Counsel requested that the trial be continued due to his illness, and the trial court suggested Co-Counsel conduct voir dire on the defense's behalf. She then discussed with the trial court her role in the case,

which did not include conducting voir dire. The trial court recessed trial until the following day and stated that Co-Counsel would be required to conduct voir dire if Counsel did not feel better. Co-Counsel did not recall whether she conducted voir dire at the Petitioner's trial. She had never conducted voir dire before the Petitioner's trial.

Co-Counsel did not recall any discussions with Counsel regarding the "accessory witness corroboration rule." She, however, could not testify that they never discussed it. She said, "I think early on, based on all the other statements that placed him there, that early on, the theory was to embrace the statement."

On cross-examination, Co-Counsel testified that she worked with Investigator Lax on a number of occasions and that he taught her how to conduct an investigation. She said that, according to Investigator Lax's memorandum of his initial meeting with the Petitioner, he left the interview feeling frustrated. Investigator Lax said, "[The Petitioner] presents as being friendly and cooperative; however, I had the distinct impression he considers this to be a game. I am fairly convinced he is not being completely truthful with us, and he finds some humor in watching us ask questions." During the second interview, Investigator Lax questioned the Petitioner about the circumstances of the offenses, and the Petitioner confirmed that his statement to the police, in which he maintained he was present but did not kill Hunter, was truthful. The Petitioner told Investigator Lax that he had read a case that had held that a defendant who is merely present at the scene of a homicide cannot be convicted of the charge.

Co-Counsel said the defense theory was that the Petitioner was expelled from the Gangster Disciples and deemed a "neutron" or "throw away" and that the other participants decided to blame him for the offenses due to his status. The defense team intended to present the testimony of Chaplain Nelson to support their defense. Co-Counsel recalled that the trial court refused to allow them to present evidence of the "neutron" theory, as well as evidence that others had confessed to the offense and then later denied involvement.

Co-Counsel testified she met with the Petitioner often and tried to keep him informed of the progression of the case. She believed the two had a good relationship. She could not recall the Petitioner's position regarding proposed testimony from Carruthers. She stated that if the Petitioner had insisted on presenting Carruthers's testimony at trial, they would have done so.

When questioned by the post-conviction court, Co-Counsel testified she believed the defense team should have further investigated the evidence of the shoeprint, in part, because the shoeprint was not the same size as the Petitioner's shoe. She also believed the jail beating of the Petitioner in 1993 should have been further developed. She questioned

whether they presented sufficient evidence to establish that the Petitioner was no longer a gang member.

Glori Shettles, a mitigation specialist with Inquisitor, Inc., testified that her responsibilities included creating a history of a defendant's life for a defense team defending a person facing a life without parole sentence or a sentence of death. She conducted an investigation into the defendant's background, family history, and school records to identify a defense strategy or an expert who could be utilized as part of the defense.

Shettles testified that she was appointed to the Petitioner's case in November 1997, which would not have allowed sufficient time to prepare the mitigation in this case if the case went to trial as scheduled on January 12, 1998. She said she did not know why she was brought into the case so close to the trial date. Shettles said when she expressed her concern about being appointed so shortly before trial, she was told, "Don't worry about it, we're gonna [sic] get a continuance. It will be okay." On January 7, 1998, she was asked to handwrite a letter to the judge explaining why she needed more time for investigation. She recalled that the trial judge was "very upset" about the possibility of a continuance. Even though the case was rescheduled for February 23, 1998, she believed that this still would not be enough time to prepare a report. After reviewing her file, Shettles said she did not think she complied with the standard of care that is set out in the guidelines governing her role as a mitigation investigator. She said that her interviews were not thorough, she did not have time for follow-up, and she did not have time to build trust or rapport with the people she was interviewing. She described her investigation as "bare bones." Shettles testified she never had a substantive discussion with either Counsel, Co-Counsel, Investigator Lax, or Dr. Auble about this case. Shettles testified that "I can't think of a case proceeding to trial where I spent as little time as I did in this case."

Shettles identified several documents that the Petitioner's post-conviction attorneys found in preparation for the post-conviction case that she said would have been "red flags" if she had been able to locate them as part of her mitigation investigation. She said, had time permitted, she would have liked to speak to the people listed in the reports. She also identified the Petitioner's medical records and school records that contained information she wished she had been able to obtain to present as part of the Petitioner's mitigation.

Shettles said that, as part of her investigation, she attempted to investigate the attack on the Petitioner while he was in jail in 1993. She requested the assistance of Chaplain Carl Nelson as a gang expert. She recalled that, during the guilt phase of the Petitioner's trial, Counsel attempted to develop a defense theory about the Petitioner's relationship with a gang and that the theory was relevant to mitigation. Shettles and Co-Counsel met with Chaplain Nelson for 1.8 hours, but she did not recall Counsel meeting with the chaplain. Shettles also

did not recall Chaplain Nelson speaking with the Petitioner or whether the chaplain was provided any records.

Dr. Paula Auble testified that the field in which she was an expert, neuropsychology, is a speciality field that deals with the evaluation of people who either are known to have brain damage or who might have brain damage and the effect of the damage. Dr. Auble described her evaluations as "extensive."

Dr. Auble testified that Co-Counsel contacted her about the Petitioner's case in October 1997. Co-Counsel told her that there were conflicting reports about the Petitioner's mental stability at the time of the offense and that he had been on Elavil, an antidepressant, since he was incarcerated. The doctor wrote a letter to the trial court before the Petitioner's trial asking for the opportunity to evaluate the Petitioner. The doctor recalled that she did not learn that she had been appointed to the Petitioner's case until November 21, 1997. She said she did not have enough time to fully evaluate the Petitioner before the January 12, 1998, trial was scheduled to start.

Dr. Auble testified that she interviewed the Petitioner, and her assistant conducted several additional tests on the Petitioner. The doctor scored the tests and sent a preliminary report of her findings to Co-Counsel and Inquisitor, Inc. Dr. Auble testified that her report was "preliminary" because her conclusions were that she needed "a whole lot more information before [she] c[ould] draw any real conclusions." Dr. Auble described her interview with the Petitioner in detail and noted what further information she needed before she could provide the defense with definitive conclusions. Dr. Auble testified she had concerns about the Petitioner's neuro-psychological functioning, traumatic experiences, and his history of head injuries. She said she thought that these warranted further investigation. She said her report expressed her concern that she needed additional information.

Inquisitor, Inc. sent the doctor additional information on January 12, 1998, but did not tell her when the Petitioner's trial was scheduled. She said she never received the Petitioner's complete medical records. She assumed that Inquisitor, Inc., would forward those to her when they received them. She said she never heard from Inquisitor, Inc or Co-Counsel about this case again, so she assumed that the Petitioner had pled guilty. It was not until 2003 or 2004 that she learned that the Petitioner's case had gone to trial.

Dr. Auble testified that, had she been asked by Counsel, she could have testified on the Petitioner's behalf during his sentencing hearing. Further, had she been given more time, she could have gathered more of the missing information that would have assisted her in fully evaluating the Petitioner. She explained ways in which she would have attempted to gather and decipher that information.

Dr. Auble said that she had conducted a thorough review of the Petitioner's background and history in preparation for the post-conviction hearing. She testified about her findings and about how she would have testified at the Petitioner's sentencing hearing based upon these findings.

Randle Stout, the Petitioner's uncle, testified that, when the Petitioner was first released from jail, he asked Stout to help him remove his tattoos. Stout said he could not afford the expense of having the tattoos removed.

Stout testified he scheduled a meeting with Counsel after the Petitioner was convicted in the shooting of Mr. Bush. The meeting included Stout's wife, Theresa Stout, and the Petitioner's mother, Francis Beasley. During the thirty-minute meeting, Stout signed a contract whereby he agreed to pay a certain amount of money before Counsel would represent the Petitioner on the murder charge involved in this case. Stout maintained Counsel did not discuss whether the State would seek the death penalty or the need for experts and co-counsel. Counsel did not state whether he had reviewed the charges or had spoken to the Petitioner before the meeting.

Stout said Beasley later informed him that Counsel intended to seek post-conviction relief on behalf of the Petitioner in the Bush case rather than a direct appeal. Stout subsequently scheduled another meeting with Counsel, but he did not recall when this second meeting occurred. He did recall, however, that he attended the meeting with his wife and Beasley. During this thirty minute meeting, Counsel explained that another attorney in the firm would represent the Petitioner in the post-conviction matter and that additional fees would not be required. Stout maintained Counsel did not discuss the first degree murder case, the appointment of Co-Counsel, or the need for experts.

Stout testified Counsel met with him, Beasley, and Theresa Stout on one other occasion before the trial. During the meeting, Counsel showed them a chart and discussed how he intended to present the case at trial. Stout said Counsel did not inform them that the State was seeking the death penalty or that Co-Counsel, Mr. Lax, Ms. Shettles, and Dr. Auble had been involved in the case.

Sergeant Hollis Hightower with the Memphis Police Department testified he was a sergeant in the robbery division in 1995 and was "marginally connected" to the investigation of the Amber Hunter homicide. Sergeant Hightower said that, in November 1995, he investigated the robbery of Willie Cox by Bowers and Gandy. The two men were apprehended for that robbery after they crashed into a nursing home following a high speed chase. The vehicle that they were driving had been reported stolen on November 9, 1995. Property seized from the stolen vehicle belonged to Quincy Adams and Oliver Mason, both

of whom had reported robberies in November 1995.  Sergeant Hightower took statements from both Bowers and Gandy on November 17, 1995.  Both admitted to participating in the robbery with each other and with another individual whom they referred to as "Taurus."  Gandy stated both Bowers and "Taurus" were armed during the robbery.  Two days later, Mason told police that he was robbed by two black men.

Sergeant Hightower testified Bowers and Gandy provided statements regarding the robbery and shooting of Walter Bush.  Bowers first told the officers that he had dropped "Taurus" off at the location of the robbery and then drove away while Gandy was asleep in the back seat.  Bowers then gave another statement in which he admitted to actively participating in the robbery.  He continued to identify "Taurus" as the shooter.  Gandy gave a statement admitting to participating in the robbery with Bowers and "the other dude."  Sergeant Hightower acknowledged that Gandy had given the statement regarding the Bush robbery after he gave the statement regarding the Mason robbery in which he identified "Taurus" as the third participant.

Sergeant Hightower said Bowers informed him that "Pico" was a relative of "Taurus" and would be able to identify "Taurus."  On November 17, 1995, a police officer went to the address where Bowers said "Pico" would be located and found only Terrell.  Bowers was shown a photograph of Terrell and did not identify him as "Taurus."  On November 20, a police officer returned to the address and located "Pico," who identified himself as Thomas Stout.  Stout identified the Petitioner, his cousin, as "Taurus."  Bowers and Gandy were shown a photograph of the Petitioner and identified him as "Taurus."  Sergeant Hightower said that Bowers and Gandy were questioned about the homicide of Amber Hunter and that they both admitted to being present at the robbery, kidnapping, and shooting of Amber Hunter.  Gandy said Bowers, the Petitioner, and Jordan were also present.

Sergeant Hightower testified he went to 189 Eastview Avenue in Memphis on November 21, 1995, at 1:45 a.m. to locate and arrest the Petitioner.  He believed he obtained the address from Thomas Stout.  Upon arriving at the address, Sergeant Hightower knocked on the door, and the Petitioner opened the door.  The officer did not request permission to enter the house and did not procure a warrant.

Sergeant Hightower testified regarding the basis for the arrest during the Petitioner's post-conviction hearing in the Bush case.  He acknowledged that he testified at the hearing that probable cause for the arrest was based upon:

The identification of Taurus as the shooter in the Bush incident by Bowers. The information provided by Bowers and Gandy leading to the location of Thomas Stout.  The identification by Thomas Stout of Taurus, as his cousin,

-21-

James Patrick Stout. The identification of a photograph of James Patrick Stout as Taurus, by Bowers and Gandy. The statement of Thomas Stout that he overheard an argument in which James Patrick Stout admitted to shooting Amber Hunter. The identification by Bowers and Gandy of James Patrick Stout as the shooter in the Hunter offense. The location of a vehicle identified by Bowers and Gandy as belonging to James Patrick Stout at an address 198 Eastview, where [he] believed James Patrick Stout resided.

Sergeant Hightower maintained that there was additional information which also established probable cause for the Petitioner's arrest. He acknowledged he previously testified that he had "ample time" to obtain a warrant for the Petitioner's arrest.

Sergeant Hightower said that he did not know Bowers and Gandy before 1995 and that they had given some statements that were self-serving and not entirely truthful. He acknowledged he testified at the post-conviction hearing in the Bush case that he was not surprised to learn that Thomas Stout had a criminal record as everyone associated with the address where he was located was a member of the Gangster Disciples. He also acknowledged he testified at the same hearing that he informed the Petitioner that he was being arrested for investigatory purposes.

Sergeant Hightower testified that, following the Petitioner's arrest, he was transported to the robbery office, arriving at approximately 2:05 a.m. Officers proceeded to interrogate the Petitioner within ten minutes of his arrival. The Petitioner gave a statement regarding the Bush case at 2:50 a.m. He was then questioned regarding the homicide of Hunter and denied any knowledge of her death. The Petitioner was transferred to the jail at 5:00 a.m. The Petitioner was questioned again regarding Hunter's death the following afternoon at 2:00 p.m. and gave a statement. Sergeant Hightower's report did not note whether the Petitioner was allowed to make a telephone call or was given the opportunity to speak to an attorney between his arrest and his statement regarding Hunter's death. Sergeant Hightower testified that the Petitioner never requested an attorney.

Sergeant Hightower testified that he took a statement from Bowers regarding Hunter's death on November 20, 1995, at 9:43 p.m. Bowers identified the car that he, Gandy, Jordan, and the Petitioner were in as a blue Chevrolet Corsica and Hunter's car as a red or maroon late-model GEO. He described the victim as a "female black, medium skin complexion, long black hair and she was kind of small to medium build, in her early 20's." He said she was wearing a "dark colored overcoat that stopped right above her knees" and "dark colored dress pumps, which are short high-heels." He also said she had a purse that was "brown two-tone, with a duck on it." Bowers identified Hunter from a photograph.

Sergeant Hightower testified that he took a statement from Gandy regarding Hunter's death on November 20, 1995, at 6:32 p.m. Gandy told Hightower that he only saw the victim from behind and said that "she had black, long hair. She had a black long jacket, she was female, black, she was young, in her thirties, or something." He also said she was driving a "[f]our door, newer model car, brick red, about a 90's model, it was a small car." Gandy was in a blue car that he believed to be a Corsica. Sergeant Hightower acknowledged he noted in his report that "both statements from Bowers and Gandy provided numerous details that only parties responsible could have known."

Sergeant Hightower testified that he took a statement from Terrell on November 20, 1995. Terrell denied participating in the robbery and homicide. Terrell said he overheard a conversation between the Petitioner and another man regarding the shooting. He also said he overheard a discussion of the shooting between Jordan, "Pistol Pete," Gandy, and Bowers. Sergeant Hightower said Terrell did not provide specific details regarding the appearance, attire, or possessions of Hunter. Sergeant Hightower was not familiar with the statement Terrell later gave to Sergeant Fitzgerald. Sergeant Hightower knew that Terrell was later charged with the offense but had little involvement in the investigation conducted by the homicide division. He was also unaware of whether Carmichael provided any details in his statement to police regarding the appearance, attire, or possessions of Hunter.

On cross-examination, Sergeant Hightower testified Bowers's initial statement about the Bush shooting was self-serving. He then questioned Gandy, who provided a different version of the events. He questioned Bowers again, and Bowers gave a second statement, implicating himself and identifying "Taurus" as the shooter. "Pico," or Thomas Stout, was identified as a relative of "Taurus."

Sergeant Hightower said that, to his knowledge, Thomas Stout was never a suspect in the homicide of Hunter. Stout told officers that he was present when the robbery was planned. He said he was invited to come along with the group but refused. He also told police officers about a confrontation between the Petitioner and Jordan during which Jordan told the Petitioner that he was wrong for killing Hunter.

Sergeant Hightower testified he did not use confidential informants to obtain information about the Petitioner. He said that, after the Petitioner was arrested and brought to the robbery division, the Petitioner waived his rights and did not request an attorney.

In response to questioning by the post-conviction court, Sergeant Hightower testified that, before the Petitioner made a statement regarding the Bush shooting, he orally advised the Petitioner of his rights. Before the Petitioner made a statement regarding Amber Hunter's death, the police officer utilized a written form of the *Miranda* warnings.

-23-

Sergeant Hightower explained that he did not obtain a warrant for the Petitioner's arrest because he believed the arrest was based upon probable cause. He was unsure whether the Petitioner would be at the address. When Sergeant Hightower arrived at the address, he saw the car that the Petitioner was supposed to have been driving parked at the residence. He also had information that the Petitioner had been involved in two violent acts. He explained, "it's 2:00 o'clock in the morning and he was a violent criminal and I thought that it was important to get him in custody."

Sergeant Hightower testified that he did not know why Bowers and Gandy admitted involvement in the robbery and homicide of Hunter or why they were not charged if they were, in fact, not involved. He said, "That would be a question that Sergeant Fitzpatrick would have to answer, but as far as my involvement and the information that I got from them, I believed that they were involved." Sergeant Hightower did not see a reason to question their statements admitting their involvement. He explained that:

> [T]hey had confessed to a series of robberies, similar in nature to what happened to [the victim], which was basically a robbery that went bad, in which the vehicles were taken and it was violent[,] it was gunfire in, at least, one of them. So I had to [sic] reason to really question and the other thing is that why would somebody confess to being present or participating in a murder when they weren't involved.

The Petitioner presented the deposition testimony of Paula Skahan, who represented Quentin Jordan and who also testified at the Petitioner's trial. Skahan recalled that the purpose of her testimony at the trial was to establish that the State had not reached an agreement with Jordan in exchange for his testimony. She was aware that Jordan implicated himself in the first degree murder when he testified and that his testimony made him vulnerable to prosecution for the maximum sentence. Skahan said she and Jordan were hoping that the prosecution would give Jordan some consideration after the Petitioner's trial. Skahan explained that she felt Jordan was less culpable than the Petitioner, in part because he was very young. She said that, based upon her experience, she believed they could reach a plea agreement with the State.

Skahan said that Jordan was required to testify truthfully at trial. She and Assistant District Attorney General Jerry Harris both believed that, initially, Jordan was not being completely truthful about his role in the offenses when he primarily blamed the Petitioner for the crime. Skahan spoke to General Harris and understood that if Jordan testified truthfully, General Harris would speak to the victim's mother about any consideration that should be given to him. She said, "he would leave it up to her as to what plea deal, if any,

consideration would be given to Quentin Jordan as well as the other co-defendants." Skahan also said that Jordan was young and personable and that she believed that if he testified truthfully, he would "end up with something he could live with."

Skahan testified she sent a letter to Jordan on July 25, 1997, stating that she spoke to General Harris, who stated he would not call Jordan to testify if Jordan maintained that the Petitioner forced him to commit the robbery. The letter also stated General Harris did not believe Jordan was telling the truth and would not waste any more time discussing the matter unless Jordan's version of the events changed to what General Harris considered to be the truth. Skahan informed Jordan in the letter that General Harris stated that, if the State did not call Jordan as a witness at the Petitioner's trial, he would take Jordan's case to trial and seek life without parole. Skahan told Jordan that she had spoken to Jordan's mother and grandmother, both of whom believed Jordan was lying to portray himself in a more positive light and that Jordan needed to be truthful. On December 20, 1997, the State filed a notice of its intention to seek life without parole against Jordan, the maximum that he could receive based upon his status as a minor at the time of the offenses. Skahan acknowledged that she had communicated an implicit threat by the State against Jordan and that the notice of intent to seek life without parole was a realization of that threat or additional pressure by the State. She also acknowledged that implicit in her letter to Jordan, and based upon her conversations with the State, was the idea that a sentence less than life without parole would be available if Jordan changed his version of the events and testified against the Petitioner.

Skahan testified she had previously defended clients in cases where General Harris was the prosecutor. She negotiated with General Harris in cases where her client was willing to testify against a co-defendant in exchange for consideration following the trial. She did not recall any case where General Harris did not agree to a preferable resolution after her client testified against a co-defendant. Skahan said that in every case in which her client cooperated, the client received a better disposition as a result. She relied upon her experience with General Harris in advising Jordan to testify, even though no promise of a deal had been made and no specifics had been discussed. Skahan said the only difference between this case and the other cases in which she negotiated with General Harris was that a family member of the victim would have to agree to any consideration. If the family member did not want General Harris to reach an agreement, no such consideration would be given. Skahan believed General Harris would attempt to convince the relative that Jordan did not deserve the same punishment as the Petitioner. She said, "I felt strongly that [Jordan] would benefit but I didn't know for sure just because a family member would have so much to say." She acknowledged that there was "sort of a gentleman's agreement" where no promises were made at the outset but that she was sure Jordan would receive a better disposition following the Petitioner's trial if he testified. Following the Petitioner's trial, Jordan entered a plea and was sentenced to 13.5 years as a violent offender at 100%.

During Skahan's deposition, she was read excerpts from the trial transcript in which Assistant District Attorney General Lee Coffee informed the trial court that the prosecution had just learned that Jordan wanted to testify. General Coffee said they did not know until the middle of voir dire that Jordan was interested in testifying. He informed the trial court, "We told him and all of these other folks that you can take the stand and you can testify and we will talk to Ms. Hunter [the victim's mother] at the conclusion of your testimony. If Ms. Hunter says try all three of you people, you're going to trial." Skahan testified she was unaware of whether General Coffee knew of her conversations with General Harris. Jordan had wanted to testify but did not want to "own up" to his full role in the offenses. Skahan did not recall exactly what she told the prosecutors during the trial, but she said she probably informed them that Jordan had changed his mind and wanted to testify as to his full involvement in the offenses. She acknowledged General Coffee's statement to the trial court that the State had never engaged in any discussion with her or Jordan about the prospect of him testifying at the Petitioner's trial was inaccurate.

Skahan said it appeared that Jordan did not decide to testify until February 1998. While Skahan could not recall the events, she said she speculated that Jordan called her and said he was willing to testify and be completely truthful. Jordan testified at the Petitioner's trial that his motivation for testifying was based upon a vow that he would do so for the victim. During closing arguments, both prosecutors capitalized on Jordan's stated reasons for testifying to bolster the impact of his testimony.

Skahan testified she filed a motion on June 12, 1997, seeking to suppress Jordan's statement to police officers. She said the filing of the motion did not illustrate an unwillingness to cooperate; rather, her attempt to protect Jordan's rights. Skahan explained that, if she did not file the motion, it would have been waived and that the trial judge would not have allowed her to file the motion later if no agreement had been reached.

Skahan said that, while Jordan probably minimized his role in his statement to the police, she believed it was human nature for people to try to portray themselves in a more positive light. She also believed this was the case in both his statement to police and in the original story that he told her and General Harris. Further, she thought Jordan wanted to testify at the Petitioner's trial but did not want to admit he had pointed the gun at the victim. With regard to the reasons that Jordan later agreed to testify, Shakan said, "Well, it would appear based on the State's pressure. Maybe it was because he was thinking about this vow. I had forgotten about this testimony. I don't know. It certainly followed after the State filed the notice, but his personal reasons, I don't know."

On cross-examination, Skahan testified that, during a meeting between General Harris,

Jordan, and her, Jordan maintained the Petitioner forced him to commit the robbery even though it appeared that Jordan had willingly participated in the robbery. General Harris informed Skahan that if Jordan continued to claim the Petitioner forced him to participate, he would not call Jordan as a witness at trial. Skahan said that, although she did not really remember, she believed that she contacted the prosecution during voir dire in the Petitioner's trial and that she and Jordan again met with the prosecutors. She also said any consideration would be based upon Jordan's truthful testimony and was subject to the approval of the victim's family. She testified she did not reach an agreement with the State before Jordan testified.

Steven Lamont Anderson testified he has been incarcerated since 1992 for second degree murder. In 1993, he was housed at the Shelby County Jail where he met the Petitioner. He said that he and the Petitioner were members of the Gangster Disciples but that the Petitioner did not appear to want to be a member. He also said the Petitioner was not knowledgeable about gangs.

Anderson recalled that, while in jail, the Petitioner was the victim of a "sheet party" during which "guys catch you off guard, throw a sheet over your head and beat you up, and you wouldn't know who it was." The Petitioner was stabbed in the head with an ink pen, and Anderson said he stopped the attack. Anderson understood that the attack was a symbol of the Petitioner's rejection from the Gangster Disciples and that the Petitioner would not be allowed to rejoin the gang following the attack. Anderson stated that, when he questioned others about the attack, he was instructed not to discuss it.

Dr. John M. Hagedorn, a professor in the Department of Criminology Law and Justice at the University of Illinois, Chicago, was admitted by the post-conviction court as an expert on the behavior and organization of gangs and the public reaction to gangs. In preparing for his testimony, Dr. Hagedorn reviewed the trial transcript; the statements of the Petitioner, the co-defendants, and other witnesses; the opinion of our Supreme Court on direct appeal; and the Petitioner's tattoos and photographs of his tattoos. He also interviewed the Petitioner for seven hours. Dr. Hagedorn testified that a common stereotype of gangs and gang members is that they are all violent and that the public generally thinks of the worst aspects of gang membership.

Dr. Hagedorn testified that not all gangs and its members are violent. Rather, a significant number of gang members later lead conventional lives. He acknowledged some gang members use drugs and engage in violence. He explained that, while some gangs are institutionalized or a permanent part of the landscape, such as the Vice Lords in Chicago, the majority of gangs are groups of neighborhood friends who socialized on the street. The more structured, institutionalized gangs engage in rituals, symbolism, and rankings. The "peer

group type of organizations," which are at the other end of the spectrum, may adopt attributes, such as names and symbols, of the more structured groups.

Dr. Hagedorn said the Petitioner joined the Gangster Disciples because his cousin was a member. The gang was not "that highly institutionalized thing with a lot of ranks and rules and all of that" but was an extension of a neighborhood group. Dr. Hagedorn stated that to be a member of a "major" gang such as the black Gangster Disciples and Latin Kings in Chicago, Illinois, the candidate must be "blessed in" during a ceremony. The Petitioner, however, was "beaten in" the gang. Dr. Hagedorn explained, "A beating in, that's for neighborhood gangs. That's that old stuff. That's the kid group stuff."

Dr. Hagedorn testified that, in prison, gangs were generally more structured and that its members were protected. When the Petitioner was in jail, he informed the members that he was unable to pay dues, and the members asked for his tennis shoes. The doctor said that, by not excusing payment of his dues and demanding his tennis shoes instead, the members demonstrated that they did not consider the Petitioner "part of the group." When the Petitioner refused to give them his shoes, he was essentially telling the gang members that his shoes were more important to him than his gang membership. He, instead, chose to be beaten out of the gang.

Dr. Hagedorn said he and a former member of the Gangster Disciples examined the Petitioner's tattoos. He described the tattoos as "sort of amateurish, hand-drawn . . . imaginary symbols" and said the tattoos were those of "a youngster trying to represent something that he has heard about and [are] not in any way symbols of a hardened gang member. They represent imagination, more than commitment." The doctor maintained that a member of the Gangster Disciples would not have many of the tattoos that appeared on the Petitioner's body. He said the tattoos established that the Petitioner "was never really deeply into the gang" and did not understand the symbology of the tattoos. He believed Counsel should have been prepared to explain the meaning of the Petitioner's tattoos and what they revealed about the Petitioner's "marginal" allegiance to the Gangster Disciples.

Dr. Hagedorn acknowledged he could not offer testimony as to what actually occurred on the night that the victim was killed. He said the theories of the defense were plausible and consistent with his research of gangs. The doctor explained that most gangs had a policy in which lower-ranking members took the blame for crimes committed by higher-ranking members. The members would also place the blame upon those who were not members of the gang. The doctor said trial counsel's argument regarding the Petitioner's status as a "neutron" was also consistent with the operation of gangs.

Dr. Hagedorn testified the Petitioner would not have attempted to rejoin the gang

following the beating in jail. He believed that, as a result, the shooting could not be characterized as gang-related if the Petitioner was the shooter. He explained gang members often "psyche" non-members up to do things that the non-members did not want to do.

Dr. Hagedorn summarized his opinion as follows:

Mr. Stout's argumentative innocence is plausible, by what we know from research about how gangs work. It is plausible that gang members will change their story and blame an identical working, a non-member, for a crime. On the other hand, if he was the perpetrator the ideology of his actions lay in his history of trauma and situational factors, not in carrying out gang orders. If he is guilty of homicide, he was no cold blooded hit man. A scenario of his being manipulated and exploited is also consistent with research on how gangs work.

The doctor believed Counsel failed to properly explain the nature of the Petitioner's gang affiliation. He said he would have presented the same testimony if he had been called as a witness at trial.

On cross-examination, Dr. Hagedorn acknowledged the existence of a gang problem in Memphis and that the Gangster Disciples were likely the primary gang in Memphis. He was aware that much of the violent crime and drug activity in Memphis was committed by affiliates of the Gangster Disciples. He testified the Petitioner received the majority of his tattoos during the time period in which he was a member of the Gangster Disciples.

Hugh Graham, a juror at the Petitioner's trial, testified that, during deliberations in the guilt phase, a juror read a passage from the Bible to other jurors that included the phrase "an eye for an eye." He said the juror was a Caucasian female. He did not recall the juror's name and could not describe her appearance.

On cross-examination, Graham testified that, during voir dire, the attorney said his decision should be based upon the evidence presented in court and the law as instructed by the trial judge. He said he based his decision on the facts that he heard in court and the law that the trial judge instructed. He also said, "I looked at the evidence. That's the reason I voted the way I did."

Isaiah "Skip" Gant, a criminal defense attorney, was admitted by the post-conviction court as an expert in capital defense representation. Gant was asked to review the case and determine whether Counsel and Co-Counsel performed pursuant to the prevailing professional norms or standard of care in their representation of the Petitioner. He was also

asked to render an opinion as to whether any failure to perform in accordance with the prevailing standards affected the outcome of the trial.

Gant testified that he was one of the attorneys appointed to represent Courtney Matthews, who was charged with four homicides that were committed at a Taco Bell in Clarksville, Tennessee. The case was tried in June 1995, and Matthews was convicted of first degree murder for each of the four victims. At the conclusion of the penalty phase, the jury sentenced Matthews to life in prison. Gant recalled that Co-Counsel worked on the Matthews case as an investigator for Inquisitor. He said Co-Counsel had recently graduated from law school and was awaiting her results from the bar exam. After she received the results, she was sworn in during the trial. Gant said Co-Counsel served as his co-counsel in the Matthews trial for one day and conducted the direct examination of one witness. Gant explained that the witness was not a significant witness and that Co-Counsel made no other presentations to the trial court. Her role remained primarily that of an investigator.

Gant testified that in 1997 and 1998, the prevailing professional standard for lawyers representing capital defendants in Tennessee was provided in the Tennessee Death Penalty Manual, a manual compiled by the Capital Case Resource Center and the Public Defender's Conference. Gant authored three chapters in the manual. In addition, the American Bar Association (ABA) had also promulgated guidelines for defense representation in capital cases. Gant said that, in 1997, the Tennessee Supreme Court amended Rule 13 to provide specific qualification requirements for capital defense attorneys. Rule 13 required attorneys who sought qualification to attend a seminar or training session on capital defense. Gant stated the information taught in the seminars was derived primarily from the manual and the ABA standards.

Gant said the manual and the ABA standards provided that an attorney should not accept more cases than he or she can handle. He explained, "But, I've been doing it long enough to know that it is very difficult for any lawyer to handle one of these cases, effectively, let alone try to do two, three, four, or say, in a two to three year period of time." He said an attorney with a large case load should not accept even one capital case.

Gant testified about the importance of pretrial motion practice as a tool for determining what evidence would be admissible. He described pretrial motion practice as a vehicle for developing the parameters of the defense. Grant opined that the Petitioner's trial counsel failed to meet the standard of care with respect to pretrial motion practice. On June 13, 1997, Counsel filed a series of one-page motions requesting relief without including supporting facts or law. Gant said Counsel filed the motions without determining a specific objective.

Gant noted several instances during voir dire in which Counsel failed to attempt to rehabilitate a potential juror. Juror Schirmer, for instance, stated he did not feel he could be a juror in the case due to his personal feelings regarding the death penalty. When questioned by Counsel, the prospective juror said he was Catholic and did not believe in the death penalty. Gant stated Counsel should have said, but did not say, "Now, you understand His Honor, or Her Honor is going to give you an instruction that says, you must follow the law, you can do that?" Gant recognized Co-Counsel's attempt to rehabilitate a prospective juror. He said that, although Co-Counsel was likely not qualified to represent the Petitioner, she was more familiar with the requirements for rehabilitating jurors than Counsel, who had represented at least five capital defendants in the same year. Mr. Gant also said,

> the jury selection and the voir dire that was conducted under this case was so woefully inadequate that I'd have to say, Your Honor, most humbly, this defendant didn't have a lawyer there at jury selection. This defendant didn't have a lawyer there at voir dire. This is how far below the prevailing standard this jury selection voir dire did go.

Gant defined an "A.D.P." or "automatic death penalty" juror as a juror who would automatically vote for the death penalty if the defendant is found guilty of first degree murder. He testified that in a well-conducted capital trial some prospective jurors are typically disqualified for cause due to their status as automatic death penalty jurors. He noted that in the Petitioner's case, no prospective jurors were disqualified on this basis. Gant said, his review of the record showed that he would have considered five of the jurors "automatic death penalty" jurors.

Gant testified that Counsel did not meet the minimum professional standards by failing to question prospective jurors regarding any bias surrounding gang affiliation. He said Counsel's failure here was exacerbated by the fact that Counsel promised to present the testimony of an expert in gang culture and did not do so. Gant believed that, had Counsel met the proper standard of care in preparing for and trying the case, the result in the guilt phase would have been different.

On cross-examination, Gant testified he did not speak to Counsel or Co-Counsel about the Petitioner's case. He was aware that the trial court had set a definite trial date with no possibility of a continuance.

In response to questioning by the post-conviction court, Gant testified that trial counsel should have filed a motion for expanded voir dire, a motion for a jury questionnaire, and a motion for individual, sequestered voir dire due to the gang issues and the Petitioner's prior convictions. He said trial counsel should have filed motions in limine regarding the

Petitioner's prior convictions, his tattoos, and the threat to Ms. Woodall. While he acknowledged the admissibility of such evidence was addressed during trial, he explained that Counsel was not prepared to argue the inadmissibility of such evidence during the trial.

Based upon this evidence, and other evidence presented, the post-conviction court subsequently entered an order denying relief regarding the guilt phase, granting relief regarding the penalty phase, and granting a new sentencing hearing. The Petitioner appeals the denial of relief with regard to the guilt phase.

## II. Analysis

On appeal, the Petitioner raises issues of ineffective assistance of counsel, that his trial counsel had a conflict of interest, prosecutorial misconduct, and juror misconduct. The Petitioner's post-conviction petition is governed by the Post-Conviction Procedure Act. *See* T.C.A. §§ 40-30-101 to -122 (2006). To obtain post-conviction relief, the Petitioner must show that his conviction is void or voidable because of the abridgement of a constitutional right. *See* T.C.A. § 40-30-103 (2006). The Petitioner must establish the factual allegations contained in his petition by clear and convincing evidence. *See* T.C.A. § 40-30-110(b)(2)(f) (2006). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010) (quotations omitted).

## A. Ineffective Assistance of Counsel

The Petitioner contends his trial counsel were ineffective in failing to: (1) raise a defense based on the accomplice corroboration rule; (2) present evidence in support of the defense theory that the Petitioner was being treated as a "throwaway" by the gang; (3) establish a foundation for the photographs of the shoeprint found in the victim's car; (4) pursue many of the pretrial motions they filed and failed to file other applicable motions; (5) raise evidentiary objections or request limiting instructions; (6) argue lack of evidence; (7) respond to allegations of gang membership; (8) cross-examine Jordan's counsel; (9) object to improper prosecutorial argument; (10) seek a mistrial due to a juror's pre-deliberation comment; and (11) conduct adequate voir dire.

The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *See Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006). This right to counsel is "'so fundamental and essential to a fair trial, and so, to due process of the law, that it is made obligatory upon the States by the Fourteenth Amendment.'" *Gideon v. Wainwright*, 372 U.S. 335, 340 (1963) (quoting *Betts v. Brady*, 316 U.S. 455, 465 (1942)).

Inherent in the right to counsel is the right to the effective assistance of counsel. *Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

The United State Supreme Court adopted a two-prong test to evaluate a claim of ineffectiveness:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687. The performance prong of the *Strickland* test requires a showing that counsel's representation fell below an objective standard of reasonableness, or "outside the wide range of professionally competent assistance." *Id.* at 690; *see Vaughn*, 202 S.W.3d at 116. Judicial scrutiny of performance is highly deferential, and "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effect of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

Upon reviewing claims of ineffective assistance of counsel, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Courts should defer to trial strategy or tactical choices if they are informed ones based upon adequate preparation. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). Criminal defendants are "not entitled to perfect representation, only constitutionally adequate representation." *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 655 n. 38 (1984)). Notwithstanding, we recognize that "[o]ur duty to search for constitutional error with painstaking care is never more exacting that it is in a capital case." *Id.* at 785.

If the petitioner shows that counsel's representation fell below a reasonable standard, then he must satisfy the prejudice prong of the *Strickland* standard by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In evaluating whether a petitioner satisfies the prejudice prong, a court must ask "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). In other words, "a petitioner must establish that the deficiency of counsel was of such a degree that it deprived the [petitioner] of a fair trial and called into question the reliability of the outcome." *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). That is, "the evidence stemming from the failure to prepare a sound defense or [to] present witnesses must be significant, but it does not necessarily follow that the trial would have otherwise resulted in an acquittal." *State v. Zimmerman*, 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991). "A reasonable probability of being found guilty of a lesser charge, or a shorter sentence, satisfies the second prong in *Strickland*." *Id.*

Claims of ineffective assistance of counsel are mixed questions of law and fact. *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). The trial court's findings of fact underlying a claim of ineffective assistance of counsel are reviewed under a de novo standard with a presumption that the findings are correct unless the preponderance of the evidence is otherwise. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001) (citing Tenn. R. App. P. 13(d)). The trial court's conclusions of law are reviewed under a purely de novo standard, with no presumption of correctness. *Id.*

### 1. Failure to Raise a Defense Based on the Accomplice Corroboration Rule

As a foundation to our consideration of this issue we note that, on direct appeal, the Petitioner challenged the sufficiency of the evidence supporting his convictions due to the lack of evidence corroborating the testimony of the accomplices. *Stout*, 46 S.W.3d at 696. The Tennessee Supreme Court held the Petitioner's statement to police and Tonya Woodall's testimony about the Petitioner's threats against her sufficiently corroborated the testimony of the three accomplices. *Id.* at 697.

In this post-conviction proceeding, the Petitioner contends his trial counsel were ineffective for failing to attack the admissibility of the corroborating evidence and for failing to present a defense based upon the lack of evidence corroborating the testimony of the accomplices. Describing the issue as "multi-layered," he argues: (1) trial counsel were ineffective in failing to pursue a motion to suppress his statements to the police; (2) trial counsel were ineffective in failing to challenge as inadmissible hearsay Woodall's testimony of a threat made to her on behalf of the Petitioner; (3) the post-conviction court's finding that

the Petitioner's admission by silence corroborated the accomplices' testimony violated the law of the case doctrine; and (4) trial counsel were ineffective in failing to argue to the jury that any corroborating evidence was insufficient as a matter of fact.

### a. Failure to Pursue a Motion to Suppress the Petitioner's Statement

The Petitioner contends that his trial counsel were ineffective for failing to seek to suppress his statement to police, which was one of two pieces of evidence the appellate court said corroborated his accomplices' testimony. The Petitioner notes that Counsel filed a motion to suppress his statement but that Counsel did not pursue this motion, which was ineffective. The Petitioner contends that the statement to police was the "fruit" of his illegal, warrantless arrest, which was a viable ground upon which Counsel should have pursued the motion to suppress. He presents numerous arguments supporting his contention that his arrest was illegal and then submits that, had his trial counsel pursued the motion to suppress, his statement would likely have been suppressed. This, he argues, would have provided less evidence corroborating his accomplices' testimony, and he surmises the jury would not have convicted him had the accomplice testimony not been corroborated. The State maintains trial counsel made a strategic decision to forgo the suppression hearing challenging the Petitioner's statement. The State also maintains that, even if trial counsel had proceeded with the suppression hearing, the motion would have been denied. We agree with the State.

### i. Strategy

Counsel testified that, although he filed a motion to suppress the Petitioner's statement, he decided to forgo a suppression hearing. He said that he wanted to utilize the Petitioner's statement to present to the jury evidence that the Petitioner did not shoot Hunter without the Petitioner having to testify at trial. The post-conviction court found that Counsel made a tactical decision to forgo a suppression hearing.

The Petitioner asserts that Counsel did not make an informed decision to forgo a suppression hearing because he admittedly failed to consider the requirement that accomplice testimony be corroborated when he made the decision. The United States Supreme Court has recognized that "[t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689; *see Felts v. State*, 354 S.W.3d 266, 277 (Tenn. 2011). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. Counsel must make "reasonable investigations" or "a reasonable decision that makes particular

investigations unnecessary." *Id.* at 691. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Id.* The determinations of what investigation decisions are reasonable depends "critically" upon such information. *Id.* "[W]hen the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether." *Id.* The failure of a particular strategy or tactical decision does not alone establish deficiency. *Felts*, 354 S.W.3d at 277.

Counsel testified that he made a tactical decision against pursuing the motion to suppress the Petitioner's statement because the statement supported the defense theory and allowed Counsel to present the Petitioner's version of the evidence without requiring the Petitioner to testify. The Petitioner told Investigator Lax that his statement to the police, in which he maintained that he was present but did not kill Hunter, was truthful. Trial counsel utilized what the Petitioner maintained was a true version of the events to formulate a defense theory. The Petitioner's statement countered the statements of the co-defendants that the Petitioner orchestrated the carjacking and killed the victim. Through the Petitioner's statement, trial counsel were able to put evidence before the jury that Bowers and Gandy, and not co-defendants Terrell and Carmichael, were present at the shooting and evidence that the Petitioner believed that the group was only going to "pop" cars and did not know that they also planned to rob people. We conclude that trial counsel's decision to conduct an investigation and formulate a defense theory based upon the Petitioner's statement to the police, which the Petitioner maintained was a true version of the events, was reasonable. Therefore, trial counsel made a strategic decision to forgo a suppression hearing and allow the State to introduce, at trial, the Petitioner's statement, which supported their defense theory. Trial counsel were not deficient in this regard.

### ii. Prejudice

Further, even if trial counsel were deficient in deciding to forgo the suppression hearing, the Petitioner has failed to establish that he was prejudiced by their performance in this regard. To establish prejudice, the Petitioner must show that, had Counsel pursued this motion: (1) the trial court would have granted the motion to suppress; and (2) there was a reasonable probability that the proceedings would have concluded differently if counsel had performed as suggested. *Vaughn v. State*, 202 S.W.3d 106, 120 (Tenn. 2006).

The Petitioner contends that the trial court would have granted his motion to suppress because he gave his statement to officers after the officers arrested him without probable cause. In Tennessee, a warrantless arrest may be made "[w]hen a felony has in fact been committed, and the officer has reasonable cause for believing the person arrested has

-36-

committed the felony." T.C.A. § 40-7-103(a)(3) (2006). While the statute does not define "reasonable cause," our courts have held that a warrantless arrest must be based on "probable cause [that] must be more than mere suspicion." *State v. Melson*, 638 S.W.2d 342, 350 (Tenn. 1982). For probable cause to exist, the facts and circumstances as they are known to the officer at the time of the arrest must be "'sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense.'" *State v. Bridges*, 963 S.W.2d 487, 491 (Tenn. 1997) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).

The Petitioner submits that the information upon which the police officer relied in arresting him was supplied by criminal informants. Tennessee law recognizes a distinction between "citizen informants, or bystander witnesses, and criminal informants, or those from the criminal milieu." *State v. Cauley*, 863 S.W.2d 411, 417 (Tenn. 1993) (internal citations and quotations omitted). Information provided by known citizens is presumed to be reliable. *Id.* If the warrantless arrest is based in part on information from an informant from the criminal milieu, the officers must be able to demonstrate that the informant: (1) has a basis of knowledge; and (2) is credible or his information is reliable. *Bridges*, 963 S.W.2d at 491; *see State v. Jacumin*, 778 S.W.2d 430, 436 (Tenn. 1989) (adopting two-prong test of *Aguilar v. Texas*, 378 U.S. 108 (1964) and *Spinelli v. United States*, 393 U.S. 410 (1969)).

The post-conviction court found that the police officers had probable cause to arrest the Petitioner. In so finding, the post-conviction court summarily rejected the Petitioner's argument that the two-prong test in *Jacumin* would apply. *Jacumin* involved a slightly different set of facts than those presented herein because it involved the determination of probable cause based upon information included in a warrant. Tennessee courts, however, have used the two-prong test in *Jacumin* to determine whether the information received from a criminal informant established probable cause justifying a warrantless arrest. *See, e.g., Bridges*, 963 S.W.2d at 491-92. Accordingly, we will determine, using the two-prong test in *Jacumin*, whether the arresting officer in this case properly relied upon any information from criminal informants.

The State maintains that, by failing to present testimony from the Petitioner, Thomas Stout, Bowers, Gandy, and co-defendant Terrell at the post-conviction hearing, the Petitioner failed to establish what evidence would have been presented had a suppression hearing been held. At the post-conviction hearing, however, the Petitioner entered into evidence, without objection from the State, the statements of those witnesses to the police, Sergeant Hightower's report of his investigation, and the transcript of Sergeant Hightower's testimony at the Petitioner's post-conviction hearing in the Bush case. We will consider these exhibits, along with the testimony at trial and at this post-conviction hearing, to determine whether Sergeant Hightower had probable cause to arrest the Petitioner without a warrant.

Sergeant Hightower's investigation into the death of Hunter began while he was investigating the robbery of Bush. Both investigations led the police to the Petitioner. Following his arrest, the Petitioner was first questioned regarding his involvement in the robbery of Bush. He gave a statement to the police in which he admitted to being present at the Bush robbery but denied shooting Bush. During this same interview, the Petitioner was then questioned regarding his involvement in the death of Amber Hunter. The Petitioner gave a statement in which he admitted to being present at the time of her shooting but denied that he shot Hunter. Sergeant Hightower testified that his determination of probable cause was based upon information that he received linking the Petitioner to both the shooting of Bush and the shooting of Hunter. Because the Petitioner's arrest relates to both incidents, the determination that probable cause existed for a warrantless arrest for either offense would justify the Petitioner's warrantless arrest.

Before arresting the Petitioner, police officers received information about the Bush shooting from Bowers, Gandy, Thomas Stout, and the surviving victim himself, Bush. According to the evidence presented at the Petitioner's post-conviction hearing, Sergeant Hightower was assigned to investigate two robberies that occurred on November 11, 1995, one committed against Oliver Mason and the other committed against Curtis Coleman and Quincy Adams. Both robberies were reportedly committed by two or three African-American men wearing blue bandanas and driving a white Ford Mustang 5.0. The perpetrators of these robberies had taken victims' vehicles. Two days earlier, on November 9, Clyde Wade had reported stolen his white Ford Mustang 5.0. On November 12, police officers recovered Adams's green Honda Accord and Mason's gray Chevrolet Cavalier behind the Spring Creek Apartments. Officers also recovered a blue Chevrolet Corsica.

On November 13, police officers saw Gandy and Bowers robbing Willie Cox. The police officers chased Gandy and Bowers as the two men fled from the scene. This high speed chase ended when Gandy and Bowers crashed the vehicle they were driving into a nursing home. Officers took the two men into custody. Bowers and Gandy were in a 1990 Ford Mustang 5.0, the same vehicle that Wade had reported stolen. The license plate on the Mustang belonged to Adams's Honda Accord. From the Mustang, police officers recovered Cox's jewelry, Mason's checkbook, a blue bandana, and a .38 caliber revolver.

On November 14, 1995, Bowers gave a statement to the police in which he admitted robbing Cox. He denied participating in any other robberies and claimed no knowledge of the items recovered from the Mustang that were linked to other robberies. The police then questioned Gandy, who admitted to participating in the Cox robbery. Gandy also gave a statement to the police in which he admitted participation in the armed robbery of Mason with Bowers and a third man, whom he said they called "Taurus."

-38-

Officers then questioned Bowers and advised him that Gandy had implicated him in other robberies. Bowers acknowledged he had not been completely truthful in his prior statements. He gave a statement about the Bush robbery and shooting, during which he and his accomplices had stolen Bush's 1989 Oldsmobile. Bowers said that, during this robbery, he was driving the Mustang, Gandy was sleeping in the back seat, and "Taurus" was also in the car. "Taurus," he said, had a "chrome .25." Bowers said "Taurus" saw Bush sitting in his car and instructed Bowers to drive around the block and drop him off. Bowers did as he was instructed. Bowers said he heard one shot fired that was "real faint." Bowers maintained that, when he dropped "Taurus" off, he believed that "Taurus" merely knew Bush. Bowers denied ever riding in Bush's car.

Officers then questioned Gandy about the Bush robbery and shooting, and Gandy gave a statement about these offenses. Gandy admitted that, on November 11, 1995, at approximately 5:42 a.m., he, Bowers, and "the other dude" participated in the robbery and shooting of Bush. Gandy said he did not know the name of the "dude" and described him as "between 20 and 24, 5-9 to 5-10, stock build, bright skinned, bold fade short, light beard." He also said the "dude" lived at the Spring Creek Apartments and drove a "Ford Escort, white, with half the grill missing, 4-dr, with the back right hub cap missing and a shiny rim."

Gandy said that Bowers knew the "dude" and that they met up at the Spring Creek Apartments. They were riding around in the Mustang while Bowers and the "dude" discussed committing the robbery. They saw Bush stopped at his house. The "dude" got out of the Mustang and walked toward Bush's gray car. The "dude" made Bush lie on the ground and began searching him. Gandy said he heard a gunshot after Bush said he did not have any money. Gandy stated the "dude" shot twice with "a .22 or .25 black and brown small automatic handgun." Bush ran toward his house while holding the back of his head. Gandy said the "dude" got into the Mustang with him while Bowers drove the victim's car. The "dude" told Gandy that he shot Bush because he did not want the victim to see his face. They followed Bowers to the Spring Creek Apartments where the "dude" took the stolen car, and Bowers and Gandy left in the Mustang. Gandy told the police that, while he knew they were going to rob Bush before the robbery occurred, he did not know that Bush would be shot.

Following Gandy's interview, Bowers gave statements to the police admitting to his participation in the robberies of Wade and Mason. Bowers said he, Gandy, and "Taurus" robbed Mason. Gandy and Bowers provided the officers with a description of "Taurus" and information about where he could be located. Bowers said "Pico" was the brother or cousin of "Taurus" and the boyfriend of "Tan." Bowers provided officers with "Pico's" address and stated "Taurus" drove a white Ford Tempo with a missing front grill.

-39-

On November 20, 1995, Bush gave a formal statement to the police informing them that three African-American men, between the ages of eighteen and twenty, had robbed him outside his home on November 11 between 3:15 a.m. and 3:30 a.m. As Bush drove up to his house, a car pulled beside him. The back passenger jumped out of the car and pointed a pistol at him. Bush said he had his car window up, and the man told him to "drop it off." Bush got out of the car and told them that he did not have any money. Bush told the robbers that he only had credit cards and retrieved them from the car after being instructed to do so. The robber took the credit cards and threw them into the car Gandy was driving. The robber asked Bush whether he would remember the robber's face, and Bush assured him that he would not. The man instructed the passenger in the front seat to get out of the car and get into Bush's car. The front seat passenger was wearing a blue bandana wrapped around his face.

Bush further said in his statement to police that the robber who had the gun pointed at him instructed him to turn around and not to run. The robber then asked Bush again whether he would remember his face. Bush again responded that he would not. The robber then shot Bush in the back of his neck. Bush stumbled to the ground and began beating on the window of his house in an effort to wake up his mother. By the time Bush's mother came to the door, the robbers had left. The robbers took his car, a 1989 Cutlass Ciera, his credit cards, and his identification. Bush said that the robber who shot him had a black revolver and that the other robber had a silver automatic.

Bush described the shooter in his statement as "5'11", medium build, about 19 to 20 years old, medium complected, with a little hair on his chin and around his mouth, with at least one gold tooth on top." Bush was unable to identify the other two men, as the passenger was wearing a blue bandana, and the driver never exited the vehicle. Bush viewed photographic lineups that included photographs of Bowers and Gandy but was unable to identify them. Bush also told the police officers that the robber who shot him continued to fire several more times at him but missed.

Following Bush's statement, law enforcement officers brought Bowers and Gandy to the office from the jail for further questioning about the information Bush had given to the police officers. Bowers admitted he had not simply driven around the block as he had previously told the police. Rather, he said he had exited the vehicle with "Taurus" and had driven Bush's car from the scene. Bowers identified "Taurus" as the shooter.

Officers then went to the Spring Creek Apartments in an effort to locate "Pico." The officers located "Pico" and identified him as Thomas Stout. Thomas Stout identified the person who the police officers were attempting to locate as his cousin, the Petitioner. Thomas Stout voluntarily came to the robbery office of the police department and provided

information linking the Petitioner to Hunter's murder. Photographs of the Petitioner were shown to Bowers and Gandy, and both men identified the Petitioner as "Taurus." A search of the Petitioner's criminal history showed that he was on parole for burglary.

On November 20, 1995, Bowers gave a second statement to the police regarding the Bush robbery and shooting in which he admitted that his first statement was not completely truthful. Bowers said that Gandy had been driving their car, that "Taurus" was in the back seat, and that he was in the front passenger seat. "Taurus," he said, exited the car to rob Bush. After approximately five minutes, Bowers got out of the car. He then heard a gunshot, and "Taurus" threw the keys to Bush's car to Bowers, who drove the car back to the Spring Creek Apartments. Bowers acknowledged that he had a black .38 revolver during the robbery and that the gun was the same one that was recovered from the Mustang when he was arrested. Bowers said he only recalled hearing one shot fired.

Following the interviews of Thomas Stout, Gandy, Bowers, and co-defendant Terrell about Hunter's murder, police officers proceeded to the house where they were told that the Petitioner could be located. A car matching the description of the Petitioner's vehicle was in the driveway. Police officers entered the home and arrested the Petitioner.

Using this summary of the facts known to officers at the time of the Petitioner's warrantless arrest, we must first identify those witnesses who were citizen informants and those who were criminal informants. A person from the criminal milieu is one who is "intimately involved with the persons informed upon and with the illegal conduct at hand." *State v. Melson*, 638 S.W.2d 342, 354 (Tenn. 1982) (internal citations and quotations omitted). Criminal informants generally supply information to law enforcement personnel not "in the spirit of concerned citizen, but often . . . in exchange for some concession, payment, or simply out of revenge against the subject." *State v. Smith*, 867 S.W.2d 343, 347 (Tenn. Crim. App. 1993) (quotations omitted). In contrast, citizen informants are either the "victims of the crime or have otherwise seen some portion of it." *Melson*, 638 S.W.2d at 354 (internal citations and quotations omitted). A citizen informant "is a witness to criminal activity who acts with an intent to aid the police in law enforcement because of his concern for society or for his own safety. He does not expect any gain or concession in exchange for his information." *Smith*, 867 S.W.2d at 347 (quotations omitted).

The facts clearly establish that Bowers and Gandy were of the "criminal milieu." Therefore, the two-part test for determining the reliability of their information as set forth in *Jacumin* applies. As a victim in the case, Bush was a citizen informant whose statement is presumed to be reliable. We now turn to consider whether Thomas Stout was also of the "criminal milieu."

The Petitioner contends Thomas Stout was also of the "criminal milieu" because he had a prior criminal history. There is no per se rule, however, requiring that courts consider anyone who has ever been convicted of a criminal offense to thereafter be of the "criminal milieu." *See, e.g., United State v. Willie Deniss*, 625 F.2d 782, 791 (8th Cir. 1980); *People v. Saars*, 584 P.2d 622, 626 (Colo. 1978); *State v. Morris*, 444 So.2d 1200, 1203 (La. 1984); *see also* W. LaFave, Search and Seizure, § 3.3 at n.84 (4th ed. 2004) ("That is not to say that a person known to have engaged in criminal conduct on some prior occasion may never qualify as a presumptively reliable citizen-informer."). Our review of the record shows that there is no evidence that Thomas Stout provided information in order to obtain some type of gain or concession with regard to his prior criminal convictions or that the police promised some type of gain or concession in exchange for information. Rather, Sergeant Hightower testified that, at the time, he was unaware of Thomas Stout's criminal convictions and considered him to be merely a witness. The evidence establishes that Thomas Stout was a witness to criminal activity and gave information to the police voluntarily. We conclude that Thomas Stout was a citizen informant whose information was presumed to be reliable. Moreover, Thomas Stout's identification of "Taurus" as the Petitioner was non-accusatory and did not describe criminal activity. *See Cauley*, 863 S.W.2d at 417 (holding non-accusatory information that did not describe criminal activity was not in the nature of a criminal informant's tip). Rather, its significance lay with the other information gathered by police. *See id.* at 417-18.

Bowers and Gandy are the only criminal informants who provided information about Bush's shooting, and their information must meet the two-prong test for reliability before we can say police properly relied upon it when arresting the Petitioner without a warrant. Under the first prong or the "basis of knowledge" prong, the facts must demonstrate that "the informant had a basis for his information that a certain person had been, was or would be involved in criminal conduct or that evidence of crime would be found at a certain place." *Moon*, 841 S.W.2d at 338. With regard to the veracity prong, the facts must demonstrate that the informant is credible or that his information is reliable. *Id.* at 339.

Bowers and Gandy established their basis of knowledge about the shooting of Bush by their own admitted involvement in the crime. With regard to the credibility or reliability prong, Gandy never denied his involvement in the shooting or any other criminal offenses about which he was questioned. All of Gandy's statements were against his penal interest. *See id.* at 340 (noting that "admission of crime may carry their own indicia of reliability"). Therefore, we conclude Gandy's statements meet the credibility or reliability prong.[2]

---

[2] We note that, apparently, the State later determined that Gandy and Bowers provided false information regarding their participation in the murder of the victim and charged co-defendants Terrell and Carmichael instead. Our examination of probable cause, however, is limited to the information that the

Unlike Gandy, Bowers denied involvement in the Bush shooting and in other criminal offenses of which he was accused. It was only after the police confronted Bowers with the information received from Gandy and others that Bowers admitted to his participation in the Bush shooting and other criminal offenses. As a result, Bowers's statements do not, in and of themselves, provide sufficient information to support a determination that he was credible or that his information regarding the Petitioner's participation in the Bush shooting is reliable.

We conclude that Gandy's statements meet the two-prong test in *Jacumin* and are sufficient to establish probable cause to arrest the Petitioner for the Bush shooting. Further, the information obtained from Thomas Stout, identifying the Petitioner as "Taurus," and Bush's statement about the shooting sufficiently corroborated Gandy's statements and Bowers's second statement of the shooting. *See Jacumin*, 778 S.W.2d at 438 (concluding that independent corroboration of an informant's statement can compensate for deficiencies in either prong). Accordingly, we agree with the post-conviction court that law enforcement officers had probable cause to arrest the Petitioner for the Bush shooting. Had trial counsel held a hearing on the motion to suppress, the motion would have been denied on this ground. The Petitioner has not offered, therefore, clear and convincing proof that he was prejudiced by trial counsels' decision not to pursue this motion.

### iii. *Payton* **Issue**

In further support of his contention that his arrest was illegal, so his motion to suppress would have been granted if pursued, the Petitioner asserts that his arrest was illegal because the officers arrested him inside his home without a warrant in violation of *Payton v. New York*, 445 U.S. 573 (1980). Both the Fourth Amendment to the United States Constitution and Article I, section 7 of the Tennessee Constitution prohibit unreasonable searches and seizures. *See* U.S. Const. amend. IV; Tenn. Const. art. I, § 7. The purpose of these provisions is to "'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" *State v. Randolph*, 74 S.W.3d 330, 334 (Tenn. 2002) (quoting *Camara v. Min. Court*, 387 U.S. 522, 528 (1967)).

Because an individual's expectation of privacy is nowhere higher than when in his or her home, a basic principle of the Fourth Amendment is that "searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton*, 445 U.S. at 586 (internal quotations omitted). "[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be

---

police knew at the time of the Petitioner's arrest. *See Jacumin*, 778 S.W.2d at 432 (probable cause determinations must be made on information known at the time of the arrest).

crossed without a warrant." *Id.* at 590. Our supreme court has observed that "'*Payton* did not draw the line one or two feet into the home; it drew the line at the home's entrance.'" *State v. Clark*, 844 S.W.2d 597, 599 (Tenn. 1992) (quoting *United States v. Berkowitz*, 927 F.2d 1376, 1388 (7th Cir. 1991)). As an overnight guest, the Petitioner had standing to challenge the arrest under *Payton*. *See Minnesota v. Olson*, 495 U.S. 91, 96-97 (1990).

We note Sergeant Hightower's testimony at the post-conviction hearing regarding the Petitioner's arrest was sparse. He testified that, on November 21, 1995, at approximately 1:45 a.m., he, Sergeant Woods, and two other police officers proceeded to 189 Eastview Avenue in Memphis to locate and arrest the Petitioner. He said that he knocked on the door and announced they were the police and that the Petitioner opened the door. Sergeant Hightower did not have a warrant and did not request permission to enter the residence. He informed the Petitioner that he was being arrested for investigative purposes. The police officers immediately transported the Petitioner to the robbery office, arriving at approximately 2:05 a.m.

The post-conviction court found that the Petitioner voluntarily came to the door but also found that this fact "does not save the arrest from *Payton*." In *United States v. Santana*, 427 U.S. 38, 42 (1976), however, the United States Supreme Court held that an individual voluntarily standing in the threshold of his home is deemed to be outside, and not inside, the home for purposes of the Fourth Amendment. The Court reasoned that an individual voluntarily standing in an open doorway has knowingly exposed himself to "public view, speech, hearing, and touch" just as if he were standing outside in a public place. *Id.*; *see also Katz v. United States*, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."). An arrest warrant is not required when the arrest is made in public based on probable cause. *United States v. Watson*, 423 U.S. 411 (1976).

In the present case, the officers knocked on the front door and identified themselves. The Petitioner then opened the door. No evidence was presented to establish that the officers engaged in any coercive conduct in an effort to persuade the Petitioner to open the door and exit the privacy of the home. *See, e.g., Sharrar v. Felsing*, 128 F.3d 810, 819 (3rd Cir. 1997) (holding that "no reasonable person would have believed that he was free to remain in the house" when the police surrounded the house, pointed machine guns at the windows and ordered the occupants to exit); *United States v. McCraw*, 920 F.2d 224 (4th Cir. 1990) (holding that the warrantless arrest was invalid when officers knocked on the door without announcing themselves; the defendant opened the door halfway and attempted to close the door when he saw the police; and officers displayed their weapons, entered the hotel room, and arrested the defendant). The police officers in the present case took no action that would lead a reasonable person to believe that he was not free to avoid answering the door and to

remain inside the home. Rather, the Petitioner's decision to open the door when the police knocked was voluntary.

When the Petitioner opened the door, the police officers asked him to identify himself. When he did so, the police officers informed him that he was under arrest. At that point, the Petitioner was not free to leave and was effectively seized for Fourth Amendment purposes. *See State v. Williams*, 185 S.W.3d 311, 316 (Tenn. 2006) (providing that a seizure occurs "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave") (quotations omitted); *see also State v. Ingram*, 331 S.W.3d 746, 757 (Tenn. 2011) (defining "arrest" as "the taking, seizing, or detaining of the person of another, either by touching or putting hands on him, or by an act which indicates an intention to take him into custody and subjects the person arrested to the actual control and will of the person making the arrest") (quotations omitted).

We note that, although no evidence was presented about the Petitioner's exact location in relation to the doorway, the Petitioner has the burden to present facts establishing a violation of *Payton*. See Keven Scott v. State of Tennessee, No. W2010-02515-CCA-R3-PC, at *10 (Tenn. Crim. App., at Jackson, Nov. 22, 2011), *Tenn. R. App. P. 11 application denied* (Tenn. Apr. 12, 2012) (holding that the petitioner bears the burden of proving the alleged prejudice, so it is incumbent on the petitioner to establish an adequate record at his post-conviction hearing upon which this Court could determine the likelihood of success of a motion to suppress). We believe "it unwise to become preoccupied with the exact location of the individual in relation to the doorway. . . . [T]he crucial issues involve the individual's reasonable expectation of privacy and whether the individual came to the doorway voluntarily." *Ducan v. Storie*, 869 F.2d 110, 1102 (8th Cir. 1989) (citations omitted). The Petitioner has failed to present facts establishing that he did not come to the door voluntarily and that he had an expectation of privacy where he was arrested. Rather, the police officers arrested the Petitioner in a public place, and no warrant was required. *See e.g.*, *McKinnon v. Carr*, 103 F.3d 934 (10th Cir. 1996) (concluding a warrantless arrest was valid when officers knocked on the door and identified themselves; the defendant opened the door; and the officers told him that he was under arrest).

The police officers in this case did not enter the residence until after the Petitioner was seized. The Petitioner slightly resisted the arrest, and the police officers entered the residence to apprehend him. However, "a suspect may not defeat an arrest which has been set in motion in a public place, and is therefore proper under *Watson*, by the expedient of escaping to a private place." *Santana*, 427 U.S. at 43. Therefore, the police officers' actions in entering the residence to apprehend the Petitioner after he resisted an arrest in a public place did not violate *Payton*.

Even if the Petitioner's arrest violated *Payton*, the exclusionary rule did not preclude the admission of the Petitioner's statement to the police. In *New York v. Harris*, 495 U.S. 14, 21 (1990), the United States Supreme Court held that "where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of *Payton*." While the Court was reluctant to adopt a "per se" rule that would limit any and all evidence from a "chain of causation" that began with an illegal arrest, the Court reasoned:

> In light of these principles, we decline to apply the exclusionary rule in this context because the rule in *Payton* was designed to protect the physical integrity of the home; it was not intended to grant criminal suspects . . . protection for statements made outside the premises where the police have probable cause to arrest the suspect for committing a crime.

*Harris*, 495 U.S. at 17; *see also State v. Jenkins*, 81 S.W.3d 252, 264 (Tenn. Crim. App. 2002) (determining that the defendant's arrest was illegal but, adopting the reasoning of *New York v. Harris* to further determine that the police had probable cause to arrest the defendant and that the exclusionary rule did not require the suppression of the defendant's subsequent statement); *State v. Steven John Chromik, III*, No. M2004-01865-CCA-R9-CD, 2005 WL 1081771, *7 (Tenn. Crim. App., at Nashville, May 6, 2005) (finding that *New York v. Harris* allowed the admission of a defendant's statement taken outside of his residence regardless of whether the police had valid consent to enter his residence because the police had probable cause to arrest the defendant).

As we have previously determined, the police officers had probable cause to arrest the Petitioner. As a result, the exclusionary rule did not require suppression of the Petitioner's subsequent statement at the police station. Therefore, even if trial counsel had pursued the motion to suppress based upon a *Payton* violation, the motion to suppress the Petitioner's statement would have been denied.

### b. Failure to Challenge the Admissibility of Woodall's Testimony

The Petitioner contends that his trial counsel were ineffective for failing to challenge Woodall's inadmissible hearsay testimony at trial that the Petitioner threatened her and her family if she testified. This testimony, he notes, was the other piece of evidence that the State argued, and the appellate court found on direct appeal, corroborated his accomplices' testimony.

At trial, the prosecutor questioned Woodall on redirect examination as follows:

Q. Mr. Massey asked you if you were scared. Are you scared?
A. Yes, I am.
Q. Who are you scared of?
A. Scared of what Pat said that–telling his people that he's going to have done to me and my family.
Q. You've been threatened.
A. By him.
Q. About coming to court and testifying?
A. Right. That's why I was–wasn't coming.

The prosecutor later questioned Woodall about her actions in avoiding the State:

Q. Would it be a fair statement to say you were avoiding us.
A. Yes.
Q. And why?
A. I was afraid.
   . . . .
Q. What were you afraid of about coming to this court and testifying?
A. Of Patrick.
Q. Afraid to what extent?
A. That he said that if I came and said anything about what I know that something would happen to me or my family.

In support of his contention that Woodall's testimony was hearsay, the Petitioner relies upon a memorandum prepared by Investigator Ron Lax of his interview with Woodall before trial. The memorandum provided: "Ms. Woodall was cooperative, however, she expressed her fear. She stated she does not want to testify in court, and when I asked why, she stated she had been threatened. Further conversation revealed that the threats had come to her from James Stout, although they were not delivered directly." This, the Petitioner contends, proves that the Petitioner himself never threatened Woodall and any threats made to her were hearsay.

The post-conviction court found that the evidence presented, namely Investigator Lax's report, was not sufficient to establish that the testimony was "excludable hearsay." The post-conviction court noted the lack of proof in the post-conviction record "about when these 'threats' were made, by whom other than the [P]etitioner they were conveyed, and what were the circumstances surrounding them." The post-conviction court concluded that, as a result, the Petitioner failed to carry his burden in showing that the testimony was excludable hearsay.

The Petitioner contends the post-conviction court improperly heightened his burden of proof by requiring that he present evidence establishing that the testimony was both hearsay and did not fall within any hearsay exception. He further contends that the post-conviction court's findings encumbered him "with the impossible burden of proving a negative." According to the Petitioner, he submitted in his brief filed prior to the post-conviction hearing that he intended to provide that Woodall's testimony was "inadmissible hearsay." He submits that as a result, "the State's failure to introduce evidence to the contrary must be taken as an admission that no such evidence exists."

Hearsay is a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Generally, hearsay statements are inadmissible unless they fall under one of the recognized exceptions to the hearsay rule. Tenn. R. Evid. 802. In order to establish prejudice for counsel's failure to object to the introduction of evidence at trial, a petitioner must present facts demonstrating that the statement was in fact hearsay that did not fit into a hearsay exception making it a reasonable probability that the trial court would have sustained the objection. *See Larry D. Upshaw v. State*, No. E2003-02071-CCA-R3-PC, 2004 WL 603360, at \*5 (Tenn. Crim. App., at Knoxville, March 26, 2004), *perm. app. denied* (Tenn. June 14, 2004). To establish a reasonable probability that the trial court would have sustained a hearsay objection to Woodall's testimony, the Petitioner must present facts demonstrating that her testimony was hearsay and did not fall within any exception. We agree with the post-conviction court that the Petitioner failed to present such facts. Absent proof regarding when the threats were made, who other than the Petitioner conveyed the threats, and the circumstances under which they were delivered, we cannot determine whether a reasonable probability exists that the trial court would have sustained a hearsay objection to the testimony at trial. Thus, the Petitioner is not entitled to relief on this issue.

### c. Law of the Case Doctrine

The post-conviction court ruled that the Petitioner was not entitled to post-conviction relief based upon trial counsel's failure to appropriately consider that the accomplice testimony must be corroborated because the Petitioner himself corroborated the accomplices' testimony by failing to respond when confronted about the shooting. This, the post-conviction court found, was the Petitioner's "admission by silence."

At trial, Woodall testified she overheard Jordan confront the Petitioner before Jordan had informed her of the shooting. Woodall said the conversation occurred in her dining room while she was sitting in her living room. The State questioned her regarding the conversation as follows:

Q.    Did you hear [the Petitioner] say anything in response to anything that J.J. said?

A.    No.  I just seen him turn and walk back out the door.

Q.    Tell the jury what you heard Quentin Jordan or J.J. say to [the Petitioner] at that time?

A.    Well, he was talking to him like he was upset about what had, you know, something had happened, and he was upset about it.  He was telling him that it wasn't right, you know.  That he wasn't supposed to have been did–it wasn't supposed to have been done like that.  And, you know, told him to go ahead on and J.J.–he turned and went out the door.  And J.J. went back down the hallway.

Q.    Did [the Petitioner] say anything at all when J.J. told him it was not right?

A.    I didn't hear him nor see him say anything.

The Petitioner submits the post-conviction court identified this testimony as corroborating evidence for the first time in the post-conviction proceedings and, therefore, violated the law of the case doctrine.  The State maintains the law of the case doctrine is inapplicable in this instance.  We agree with the State.

Under the law of the case doctrine, a court generally may not reconsider issues that have been decided in a prior appeal of the same case.  *State v. Jefferson*, 31 S.W.3d 558, 560-61 (Tenn. 2000).  The doctrine is most often invoked when a trial court encounters a previously litigated issue in the course of carrying out an appellate court's instructions upon remand.  The rule is "based on the common sense recognition that issues previously litigated and decided by a court of competent jurisdiction ordinarily need not be revisited."  *Memphis Publ'g Co. v. Tenn. Petroleum Underground Storage Tank Bd.*, 975 S.W.2d 303, 306 (Tenn. 1998).  The rule "promotes the finality and efficiency of the judicial process, avoids indefinite relitigation of the same issue, fosters consistent results in the same litigation, and assures the obedience of lower courts to the decisions of appellate courts."  *Id.*

The Petitioner maintains that the law of the case doctrine also applies to post-conviction proceedings.  This Court has applied the law of the case doctrine in post-conviction proceedings where the petitioner raised the same issue both on direct appeal and as a free-standing claim in post-conviction proceedings.  *See e.g.*, *William G. Allen v. State*, No. M2009-02151-CCA-R3-PC, 2011 WL 1601587, at * 7-9 (Tenn. Crim. App., at Nashville, Apr. 26, 2011), *perm. app. denied* (Tenn. Aug. 25, 2011); *James O. Martin v. State*, No. E2004-01908-CCA-R3-PC, 2005 WL 2086039, at *4 (Tenn. Crim. App., at Knoxville, Aug. 29, 2005), *no Tenn. R. App. P. 11 application filed*.  This Court has also applied the law of the case doctrine to issues of ineffective assistance of counsel raised both

on direct appeal and in post-conviction proceedings. *John Earl Scales v. State*, No. M2003-01753-CCA-R3-PC, 2004 WL 1562542, at *6 (Tenn. Crim. App., at Nashville, July 13, 2004), *perm. app. denied* (Tenn. Nov. 8, 2004). Neither of these circumstances exist in the present case. The issue of whether the evidence was sufficient to corroborate the testimony of the Petitioner's accomplices has been previously litigated. The issue, however, of whether trial counsel were ineffective in failing to challenge the admissibility of the corroborative evidence or argue the lack of sufficient corroboration has not been litigated previously. Therefore, as it concerns the issue of ineffective counsel, the law of the case doctrine does not apply to the post-conviction court's finding that the Petitioner's admission by silence also corroborated the testimony of his accomplices.

The Petitioner also submits that trial counsel were ineffective in failing to object to Woodall's testimony about the confrontation of the Petitioner by Jordan as hearsay, and in failing to cross-examine her regarding the confrontation. The Petitioner, however, has waived these issues for failing to raise them in his original or amended post-conviction relief petitions. *See* Tenn. Sup. Ct. R. 28, § 8(D)(4). Regardless of waiver, we note that trial counsel did object to the testimony as hearsay and that the trial court overruled the objection. Furthermore, the Petitioner failed to establish what additional information any cross-examination of Woodall regarding the confrontation would have revealed. The Petitioner is not entitled to relief on this issue.

### d. Failure to Argue Insufficiency of Corroboration as a Matter of Fact

The Petitioner avers trial counsel were ineffective in failing to argue to the jury that the evidence was insufficient to corroborate the accomplices' testimony as a matter of fact. However, the Petitioner's statement to police and Woodall's testimony sufficiently corroborated the testimonies of the accomplices. Accordingly, had trial counsel argued lack of sufficient corroboration of the accomplices' testimonies, it would not have resulted in a different verdict.

### 2. Failure to Submit Evidence Supporting the "Throwaway" Theory

The Petitioner next contends that his trial counsel failed to present a defense based upon a theory that he was a "throwaway," meaning in this case that the Petitioner, as a low-ranking, ex-member or non-member of the gang, was falsely identified by the higher ranking gang members as the perpetrator of a crime that he did not commit.

At trial, trial counsel argued that, although the Petitioner was in the car with those who abducted and killed the victim, he was merely a passive observer who was unaware that the carjacking, abduction, and murder would occur. According to the defense theory, the

Petitioner was once a member of the Gangster Disciples but was "beaten out" of the gang in 1993 while he was incarcerated. As a result, he became a "neutron" or a "throwaway" for gang activity. The defense team sought to establish that gang members Bowers, Gandy, and Jordan actually committed the offenses against Hunter; that his co-defendants Carmichael and Terrell agreed as lower ranking gang members to "take the rap" for Bowers and Gandy; and that active gang members all agreed to implicate the Petitioner, who was a "throwaway" or outsider, as the actual perpetrator. In support of this theory, the defense sought to introduce the initial statements of Bowers and Gandy to the police in which they stated that they were present at the scene; the testimony of Makimba Fowler, a member of the Gangster Disciples who had been incarcerated with the Petitioner in 1993 and was familiar with the gang's "beating out" ritual; an incident report prepared by jailer Donald Justus after the Petitioner received a black eye in 1993; and the testimony of Chaplain Nelson, an expert on gangs, who would have testified regarding the gang practices of blaming crimes committed by gang members on non-members and of lower-ranking gang members implicating or substituting themselves in crimes committed by higher-ranking gang members. The trial court ruled that the majority of this evidence was inadmissible.

The Petitioner's difficulties with presenting his theory of defense began during opening statements. Counsel referred to the Petitioner's mother giving the Petitioner to his grandmother when he was two weeks old, and the State objected. During a hearing outside the presence of the jury, Counsel described the theory of defense and the supporting proof. The trial court reserved its evidentiary rulings but was concerned about the admissibility of much of the evidence described by Counsel. The trial court noted the events surrounding the Gangster Disciples beating the Petitioner in 1993 while in jail were too remote to be relevant. The trial court stated:

Even if you had direct proof through the testimony of your client to exactly what you say happened in '93, it seems to me that so much time passed between June of '93 and November of '95, that to draw a correlation between the activities of one and the activities of another is just really, really remote. It's really a stretch I think.

And I just–unless I hear–unless we have, you know, an offer of proof and a couple of days hearing right now, I just think that it's a stretch to tie those two together. Even if that happened in '93, he could have been in and out of the gang ten more times between June of '93 and November of '95. He could have had a dozen different meetings with gang members in ten different gangs. And who knows what he could have done during those two and a half years that–what intervening circumstances might have made the '93 incident totally irrelevant to the '95 activity.

-51-

As a result, the trial court did not allow Counsel to discuss the events in 1993 during opening statements and instructed him to confine his opening statement to the events that related to the killing of Hunter on November 5, 1995.

During his opening statement, Counsel also sought to refer to the initial statements of Bowers and Gandy to police, in which they admitted to participating in the events leading to Hunter's death. The trial court asked Counsel whether he intended to call Bowers and Gandy as witnesses, and Counsel declined to commit to calling these witnesses. The trial court instructed Counsel not to refer to their statements in opening argument unless Counsel planned to call Bowers and Gandy to testify.

During trial, Counsel asked Sergeant Hightower on cross-examination whether, following his interviews of Bowers and Gandy, he noted in his report that they provided numerous details that only the parties responsible could have known. The State objected. The trial court sustained the objection, finding that Counsel was attempting to ask about the contents of the statements of Bowers and Gandy, which were hearsay.

After the State rested its case, Counsel informed the trial court during a jury out hearing that he anticipated calling either Bowers, Gandy, or both as his next witnesses. The prosecutor responded that because Bowers and Gandy were the Petitioner's co-defendants in the robbery of Walter Bush, evidence of the robbery would be admissible pursuant to Tennessee Rules of Evidence 404(b) if either Bowers or Gandy testified. The prosecutor argued that evidence of the Bush robbery was relevant to show a common scheme, purpose, or plan; to show intent; and to identify those who committed a spree of robberies over a short period of time. After considering argument from both parties and the proof presented, the trial court found that evidence of the Bush shooting was admissible under Tennessee Rules of Evidence 404(b). The trial court explained:

> So my ruling is that in the event the defense puts on proof of Mr. Bowers and/or Mr. Gandy or from anyone else for that matter relating to–but I guess they would be the logical witnesses that have been discussed today, put on proof from either or both of those witnesses pertaining to what they may know about this case, then it would open the door for the State to get into the 404(b) proof of the Bush matter, Mr. Bowers and Mr. Gandy being the co-defendants with Mr. Stout in that Bush matter.

Counsel then asked the trial court whether he would be allowed to present evidence from Sergeant Justus and Fowler regarding the beating of the Petitioner while in jail in 1993 and the testimony of Chaplain Nelson. During the guilt phase of the trial, Counsel informed the trial court that Fowler was incarcerated with the Petitioner in 1993 but did not recall the

beating.  Counsel said Fowler could only testify that members of the Gangster Disciples would expel other members by throwing a sheet over their heads and beating them.  Sergeant Justus, a jailer in 1993, prepared a report of the Petitioner's bruised eye and medical treatment but did not observe the Petitioner being injured.  Chaplain Nelson would testify regarding the gang practice of blaming non-members for crimes committed by gang members.  The trial court found that the evidence was irrelevant absent direct evidence that the Petitioner had been beaten out of the gang and remained a non-member at the time of Hunter's murder.  The trial court noted such proof could include the Petitioner's own testimony.

During a voir dire of the Petitioner, the Petitioner testified that he understood the trial court's ruling and that he did not want to testify.  He also testified that, due to the trial court's ruling regarding the admissibility of the evidence of the Bush robbery, he believed it would be unwise to call Bowers and Gandy as witnesses.  The defense then rested its case.

The Petitioner contends that trial counsel were ineffective in failing to present evidence to support this defense theory.  Specifically, he submits that trial counsel failed to present evidence that (1) the State misidentified the parties to the offense, (2) the co-defendants falsely testified that he was the shooter, and (3) he was merely present and did not participate in the offense underlying the felony murder for which he was convicted.

### a.  Misidentification of the Parties

The Petitioner argues trial counsel failed to present evidence that Bowers and Gandy, not co-defendants Terrell and Carmichael, were present when the victim was abducted and killed.  He further argues that trial counsel could have introduced such evidence through the cross-examinations of Terrell, Carmichael, Woodall, and Sergeant Hightower.

### i.  Robert Terrell

The Petitioner maintains that trial counsel failed to adequately cross-examine Terrell regarding Terrell's initial statement to the police.  On November 20, 1995, Terrell informed Sergeant Hightower that he was at Woodall's apartment "about a week and a half ago" when the Petitioner and Jordan arrived and began arguing.  Terrell told the Sergeant Hightower that the Petitioner said he "had to plug this whore" and began laughing.  Jordan told the Petitioner that he was wrong for what he did, cursed him, and told the Petitioner not to come around him anymore.  The Petitioner and Jordan then stepped outside the apartment on the stairway and talked.

Terrell told the police that Bowers and Gandy arrived twenty to thirty minutes after

the Petitioner and Jordan arrived. They were not present when the confrontation between the Petitioner and Jordan occurred. Terrell stated that Bowers, Gandy, and everyone else at the apartment told the Petitioner that he was wrong for shooting "that woman." The Petitioner laughed and said that the woman was pretty and that he should have had sex with her.

Terrell said he did not see any of the items taken from the victim and was not told anything else about the incident. Terrell was asked whether he was at the apartment earlier that night when the Petitioner, Jordan, Gandy, and Bowers left together, and Terrell said he was not there. Sergeant Hightower also asked Terrell whether he saw the car that they were driving that night. Terrell said Jordan told him that it was a blue Corsica.

The Petitioner asserts that trial counsel failed to elicit testimony from Terrell that he initially denied being present when the offense occurred and that he identified Bowers and Gandy as parties to the offense. A careful reading, however, of Terrell's statement to the police reveals that he did not identify Bowers and Gandy as participating in the offense. He simply stated that Bowers and Gandy arrived at the apartment following a confrontation between Jordan and the Petitioner and that Bowers and Gandy, as well as everyone else at the apartment, told the Petitioner that he should not have shot the victim. Moreover, it was Sergeant Hightower, not Terrell, who stated while questioning Terrell that the Petitioner, Jordan, Bowers, and Gandy left the apartment together earlier. Terrell denied being present at the apartment earlier that night.

Terrell testified at trial to his participation in the murder. Bowers and Jordan also testified about Terrell's involvement. On cross-examination, Terrell denied that Bowers and Gandy were involved and denied that Bowers told him to "take the rap." Therefore, additional questioning by trial counsel would not have discredited evidence of Terrell's participation in the offense.

### ii. Terrell and Carmichael

The Petitioner contends that, unlike the statements of Bowers and Gandy, the statements and testimony of Terrell and Carmichael did not include any details about Hunter's appearance, clothing, or property. According to the Petitioner, trial counsel were ineffective in failing to cross-examine Terrell and Carmichael about the lack of such details. As the State correctly notes, the statements and testimony of Carmichael and Terrell do not reflect that they were unable to describe Hunter in detail but that they were never asked to provide such detail. The Petitioner failed to establish through the post-conviction evidence that Terrell and Carmichael could not describe in detail Hunter's appearance, clothing, or property taken, but only that they were never asked to provide such a description. Moreover, on direct examination at trial, Carmichael was shown a photograph of Hunter, and he

-54-

identified her as the woman whom the Petitioner shot. Absent proof of the response of Terrell and Carmichael had they been asked to describe Hunter's appearance, clothing, and property, we cannot conclude that trial counsel were deficient in not questioning them about those details.

The Petitioner faults trial counsel for failing to highlight during the cross-examination of Terrell and Carmichael "the highly suspicious symmetry between their testimonies." He asserts that, unlike the statements of Bowers and Gandy, Terrell and Carmichael provided "symmetrical descriptions of the victim's manner of death as orchestrated single-handedly by Petitioner." According to the Petitioner, the inference to be drawn from the comparison of the statements is that Bowers and Gandy had no opportunity to synchronize their stories before giving statements to the police while Carmichael and Terrell had such an opportunity.

In order for trial counsel to argue such an inference at trial, however, it would have been necessary to present the statements of Bowers and Gandy to the jury. The trial court held their statements were inadmissible hearsay and refused to allow any witnesses, including Sergeant Hightower, to mention the content of the statements. Furthermore, trial counsel decided not to call Bowers and Gandy as witnesses after the trial court found that evidence of the Petitioner's shooting of Bush in a similar offense would be admissible. On direct appeal, this Court upheld the trial court's ruling regarding the admissibility of evidence of Bush's shooting. *See Stout*, 46 S.W.3d at 717-18 (appendix). Without the statements of Bowers and Gandy to compare and argue the inference claimed by the Petitioner, evidence of the similarities between the statements of Terrell and Carmichael would strengthen, not weaken, the State's case. Moreover, on cross-examination, both witnesses denied discussing their testimony with each other prior to trial. The Petitioner is not entitled to relief with regard to this issue.

The Petitioner next avers trial counsel were ineffective in failing to enter the statements of Terrell and Carmichael in the record so that the appellate courts could compare their statements with the statements of Bowers and Gandy. The Petitioner further avers that, due to trial counsel's failure, "there could be no effective appellate review of this evidence." The Petitioner, however, does not explain how the appellate review was ineffective absent the statements. There is nothing in the record establishing that this Court or the Tennessee Supreme Court would have reached a different decision had the statements been included in the appellate record. The Petitioner is not entitled to relief on this issue.

### iii. Woodall

The Petitioner contends trial counsel failed to highlight on cross-examination the discrepancy between Woodall's testimony on direct examination and the State's theory of

the case. He maintains that Woodall's testimony reflected that she was in effect an alibi witness for Terrell and Carmichael and contradicted Jordan's account of the events to her regarding the involvement of Terrell and Carmichael.

On direct examination, Woodall testified that, at approximately 6:00 or 7:00 p.m., on November 8, 1995, the night of Ms. Hunter's murder, Jordan, Carmichael, and Terrell were at her apartment. The Petitioner arrived later. Woodall denied that Gandy and Bowers were at her apartment that night. The prosecutor then questioned her as follows:

Q. Did Mr. Stout leave your apartment on November 8, 1995?
. . . .
A. Yeah, he did. He came up and left. Yeah.
Q. Who did he leave with?
A. With [Mr. Jordan].
Q. Did he leave with anybody else?
A. I didn't see anybody else.

The Petitioner maintains that this testimony establishes that Jordan and the Petitioner left Ms. Woodall's apartment alone and that Terrell and Carmichael never left the apartment. As a result, the Petitioner characterizes Woodall as an alibi witness for Terrell and Carmichael. Woodall, however, never testified that the Petitioner and Jordan left the apartment alone or that Terrell and Carmichael never left the apartment. Rather, she simply stated she did not see anyone else with them. Her testimony does not preclude the possibility that others could have left the apartment with Jordan and the Petitioner without her seeing them do so.

The Petitioner also complains of the following cross-examination of Woodall by trial counsel:

Q. Okay. Do you remember being asked [by police] is there anything else that you would care to add to your statement? Your answer, I asked [Jordan] who all was with them, and he said [Terrell] and [Carmichael]. That's when I said, you didn't tell me that the other night, and he said, I know.
A. That was the same morning of when we got picked up.

The Petitioner argues that this question gave the jury reason to believe that Woodall supported an account that placed Carmichael and Terrell at the scene. Based upon our review of the record, however, we note that Counsel asked this question in order to demonstrate that, when Jordan first told Woodall of the events, he never mentioned any

involvement by Terrell and Carmichael. Rather, Jordan waited until sometime later to mention to Woodall that Terrell and Carmichael were involved. We cannot conclude that Counsel was ineffective in such questioning.

### iv. Sergeant Hightower

After taking statements from both Bowers and Gandy, Sergeant Hightower noted in his report that "both statements from Bowers and Gandy provided numerous details that only parties responsible could have known." When Counsel questioned Sergeant Hightower at trial about the notation, the State objected. The trial court sustained the objection, finding that Counsel was attempting to ask about the contents of the statements of Bowers and Gandy, which were hearsay.

On direct appeal, this Court concluded the trial court erred in disallowing the testimony. *Stout*, 46 S.W.3d at 713-14 (appendix). We noted that questions regarding Sergeant Hightower's own conclusions of his investigation of the case, when properly asked, would not have called for hearsay. *Id.* at 714 This Court held that the error was harmless, noting:

> While Hightower may have initially concluded that Bowers and Gandy had been involved in the crimes against Hunter, subsequent events led the State to conclude that they were not. Hence, they were not charged in the indictments. Had Hightower been allowed to testify about his initial conclusions, the State would have been entitled to question him about whether and why he later changed those conclusions.

*Id.*

The Petitioner asserts Counsel was ineffective in failing to make an offer of proof regarding this testimony. According to the Petitioner, if Counsel had made an offer of proof, this Court would not have found the trial court's error in disallowing testimony regarding Sergeant Hightower's investigation to be harmless. Sergeant Hightower, however, admitted at the post-conviction hearing that he could not provide an answer as to why Bowers and Gandy were not charged due to his limited role in the investigation. He said he was "marginally connected" to the investigation. He never interviewed Carmichael or Jordan and did not participate in the second interview of Terrell. Sergeant Hightower acknowledged that only Sergeant Fitzpatrick could answer the question of why Bowers and Gandy were not charged. Sergeant Fitzpatrick, however, did not testify at the post-conviction hearing.

The Petitioner notes Sergeant Hightower testified that he showed a photograph of

Terrell to Bowers, who denied that Terrell was involved. Sergeant Hightower's report, however, reflects that Bowers was shown Terrell's photograph in connection with the investigation of the robberies of Clyde Wade, Willie Cox, and Oliver Mason, and not in the investigation of Hunter's murder. It was three days after Bowers was shown the photograph that the police received information regarding the potential involvement of Bowers, Gandy, and the Petitioner in Hunter's murder. Accordingly, we cannot conclude that this Court would have reached a different result had Counsel made an offer of proof.

The Petitioner also faults trial counsel for failing to cite to the statements of Bowers and Gandy on direct appeal. As acknowledged by the Petitioner in his "Notice of Correction of Mistaken Stipulation" filed in the post-conviction court, the statements of Bowers and Gandy were included in the appellate record on direct appeal for review by this Court and the Tennessee Supreme Court. This Petitioner is not entitled to relief as to this issue.

### b. The Petitioner's Role in the Offense

The Petitioner submits that trial counsel were ineffective in failing to establish that members of the Gangster Disciples identified him as the shooter because he was a "neutron" or "throwaway." Specifically, he submits that trial counsel failed to present evidence establishing that he was not a member of the Gangster Disciples at the time of the offense and that the use of a "neutron" was a common practice of the Gangster Disciples. The Petitioner maintains trial counsel should have interviewed inmates who were incarcerated with him in 1993, such as Fowler and Steven Anderson, and retained a gang expert, such as Dr. Hagedorn.

During the guilt phase, trial counsel informed the trial court that Fowler did not recall seeing the Petitioner being beaten and could only testify that Gangster Disciple members would expel other members by throwing a sheet over their heads and beating them. During the penalty phase, however, Fowler testified that he recalled witnessing the Petitioner being beaten out of the Gangster Disciples and that the Petitioner was no longer a member of the gang. Fowler also testified outside of the jury's presence that he had never been interviewed by trial counsel. Counsel expressed surprise at Fowler's testimony.

Even if Counsel had been aware of Fowler's testimony during the guilt phase of the trial, we cannot conclude that the trial court would have reversed its position and allowed Counsel to introduce the evidence. Fowler acknowledged that he pled guilty to second degree murder in July of 1993 and was transferred to a prison in Nashville, Tennessee, in September of 1995. Because Fowler was imprisoned in Nashville at the time that Hunter was murdered, he was unable to provide the direct evidence that the Petitioner was not a gang member at the time of the murder that the trial court demanded. Likewise, Anderson only

testified to the events of 1993. Moreover, contrary to the Petitioner's assertions, trial counsel did retain an expert on gangs, Chaplain Nelson, whose testimony the trial court refused to admit.

As this Court explained on direct appeal,

> Officer Hightower testified that when he initially questioned [the Petitioner] on November 21, 1995, [the Petitioner] admitted to being a member of the Gangster Disciples. Jordan also testified the [Petitioner] was a member of the gang. If the uncontroverted proof established that [the Petitioner] was a member of the gang in November 1995, any proof regarding what happened to non-members was utterly irrelevant. Irrelevant evidence is inadmissible. Tenn. R. Evid. 402.

*Stout*, 46 S.W.3d at 714 (appendix). The additional evidence offered by the Petitioner does not change this result.

### c. The Petitioner's Awareness That the Underlying Offense Would Occur

The Petitioner maintains that trial counsel were ineffective in failing to present evidence that he was unaware that a "crime of violence" might occur when he agreed to join Bowers, Gandy, and Jordan but believed that they were only planning to "pop" cars. He also faults trial counsel for failing to challenge the State's lack of evidence regarding such knowledge. He submits that, absent evidence that he knew a "crime of violence" would occur when he agreed to go with the men, he could not have been convicted of felony murder regardless of his actual role in the offense.

At trial, Sergeant Hightower testified regarding the Petitioner's statement in which he maintained that he believed Bowers, Gandy, and Jordan planned to "pop" cars and that he had no knowledge that a robbery, carjacking, or murder would occur. The jury rejected the Petitioner's claim. The Petitioner identifies the testimony of Dr. Hagedorn regarding the Petitioner's understanding of the meaning of "popping" cars as evidence of his lack of knowledge. We, however, cannot conclude that there is a reasonable probability that this additional evidence would have resulted in a different verdict. The Petitioner is not entitled to relief on this issue.

### d. Post-Conviction Court's Findings

During the penalty phase of the trial, trial counsel sought to introduce testimony from Bowers, Gandy, and Chaplain Nelson. The trial court excluded the evidence finding that the

-59-

Petitioner was attempting to re-litigate the issue of guilt. The Tennessee Supreme Court held that the trial court erred in refusing to admit the evidence but that the error was harmless beyond a reasonable doubt. *See Stout*, 46 S.W.3d at 705. The Court reasoned:

> The problem with the [Petitioner]'s theory, however, is that Bowers and Gandy, like the accomplices who testified during the guilt phase, inculpated the [Petitioner] as the one who led the offenses and shot the victim. Moreover, the [Petitioner] made no proffer indicating that the testimony of Bowers or Gandy would differ from these statements. Bowers in particular was unlikely to have testified that he shot the victim as alleged by the [Petitioner]. Indeed, in absence of a proffer, the [Petitioner] simply contends that Bowers and Gandy would have had to be impeached with their prior statements, further rendering the proposed mitigating evidence of dubious value.
>
> Likewise, the testimony of an expert on gang culture, who did not know the [Petitioner] or any of the gang members, would have conflicted with the [Petitioner]'s statement to police in which he admitted being a member of the gangster disciples. Moreover, there was other evidence regarding the [Petitioner]'s theory that he was falsely accused by gang members because he was a former member, and it was obviously rejected by the jury.

*Id*.

The post-conviction court granted the Petitioner relief regarding the penalty phase based upon trial counsel's failure to investigate and present mitigating evidence regarding the Petitioner's background. The post-conviction court also found that trial counsel were deficient in failing to make an offer of proof regarding Sergeant Hightower's explanation as to why Bowers and Gandy were not charged and in failing to cite to the statements of Bowers and Gandy in the Petitioner's brief on direct appeal. The post-conviction court explained that:

> if the failure to present mitigating evidence would not alone be sufficient for a new sentencing hearing, then the proof of mitigation which the jury should have heard should be considered in conjunction with the proof of the participation of Bowers and Gandy, which the jury should have also heard. Trial counsel's error, as set forth above, contributed to the appellate court's finding that the exclusion of Bowers' and Gandy's confessions in the 1998 trial were harmless. The exclusion of that evidence, for reasons explained above, can no longer be considered harmless when considered with the mitigation evidence that the jury should have heard.

The Petitioner contends the post-conviction court's findings that trial counsel were ineffective in the penalty phase of the trial also dictates a finding of ineffective assistance of counsel in the guilt phase. We have examined trial counsel's failure to both make an offer of proof and to cite to the statements of Bowers and Gandy in the Petitioner's appellate brief on direct appeal. In our view, the Petitioner is not entitled to relief on either issue as they relate to the guilt phase of the trial. We decline to extend the post-conviction court's findings regarding the ineffective assistance of counsel at the penalty phase to the guilt phase.

### 3. Failure to Establish a Foundation for the Shoeprint Photographs

The Petitioner argues that trial counsel's failure to call the photographer to authenticate photographs of a shoeprint left on the driver's side door of the victim's car constituted ineffective assistance of counsel. The State maintains the Petitioner has not proven the admission of the photographs would have changed the outcome of the trial. We agree with the State.

During the cross-examination of Sergeant Hightower, Counsel attempted to introduce a photograph of a shoeprint on the floorboard of Ms. Hunter's car. The State objected, arguing that Sergeant Hightower did not take the photograph and could not otherwise authenticate it. The trial court sustained the objection.

During a jury-out hearing after the State had rested its case, the prosecutor informed the trial court that, during a meeting with trial counsel prior to trial, he had given trial counsel a list of all of the State's potential witnesses, reviewed the photographs of the crime scene, and informed trial counsel that Officer W.L. Harsley took the photographs. Trial counsel denied that the prosecutors identified Officer Harsley as the photographer. Trial counsel said that, while they had not issued a subpoena for Officer Harsley, they had not done so because he was listed as a witness for the State. The police officer, however, was not presented as a defense witness at trial.

The post-conviction court found that trial counsel were deficient in failing to present the proper witness to authenticate the photograph, but that the deficiency did not result in prejudice. We agree with the post-conviction court's finding that no evidence was introduced at the post-conviction hearing "that would indicate that even if this footprint photograph was reviewed by the jury that it would impeach the State's case or indicate that the petitioner was not the person who killed Ms. Hunter." The Petitioner is not entitled to relief with regard to this issue.

### 4. Failure to Pursue Pretrial Motion Practice

The Petitioner faults trial counsel for failing to file motions prior to trial to determine the admissibility of the statements of Bowers and Gandy; the testimony of Fowler, Sergeant Justus, and Chaplain Nelson; the jail incident report completed by Sergeant Justus; facts regarding the Petitioner's prior conviction in the Bush robbery; and the permissible scope of cross-examination of defense witnesses about the Petitioner's past acts.

The post-conviction court found trial counsel were not ineffective, noting:

> There is an amorphous complaint regarding the failure of trial counsel to file pretrial motions. This is presented to the Court as if there was a quota of motions that must be filed. Such is not the case. There was no showing that this lack of motion practice prejudiced the [P]etitioner.

We agree with the findings of the post-conviction court. The Petitioner is not entitled to relief with regard to this issue.

### 5. Failure to Raise Evidentiary Objections or Request Limiting Instructions

The Petitioner identifies a number of instances in which he claims trial counsel improperly failed to object or request a limiting instruction. He first claims trial counsel were ineffective in failing to object to the medical examiner's testimony that Hunter may have experienced "lock-out" as speculative and in failing to object to the prosecutor's statement regarding "lock-out" in the closing argument.

At trial, the medical examiner testified that, based upon her examination of Hunter's brain and the path of the gunshot wound, it was possible that Hunter experienced "lock-out." The doctor described "lock-out" as a condition in which "your mind is alive, but you are unable to move your fingers, your toes, your mouth, your eyelids. You cannot communicate." Trial counsel objected to the relevancy of the testimony, and the trial court overruled the objection. The Petitioner has failed to present facts establishing that the trial court would have sustained any objection based on speculation or that a reasonable probability exists that the admission of the evidence affected the outcome of the guilt phase of his trial.

The Petitioner submits that trial counsel were ineffective in failing to object to the testimony of Sergeant Hightower and Officer Woods about the Petitioner's request for a settlement in his case. The Petitioner simply states in his brief that "[t]his testimony should have been excluded under Tenn. R. Evid. 408." The Petitioner has waived this issue by failing to reference the record or support the issue by argument. *See* Tenn. Ct. Crim. App. R. 10(b). Regardless of waiver, the Petitioner has failed to present facts establishing that trial

counsel were deficient and that any deficiency resulted in prejudice.

The Petitioner also faults trial counsel for failing to request limiting instructions for "Hightower's improper testimony regarding Petitioner's alleged state of mind" and "Woodall's inadmissible testimony about Petitioner's alleged state of mind." These issues are waived due to the Petitioner's failure to offer any argument or citations to case law supporting his claim. *See id.*

### 6. Failure to Argue Lack of Evidence

The Petitioner contends trial counsel failed to develop, thorough cross-examination of the State's witnesses, and then argue to the jury the proposition that the State lacked critical physical evidence. At trial, Carmichael, Terrell, and Jordan testified that following the shooting of Hunter, her car was "wiped down," which explained the lack of physical evidence linking the Petitioner to the shooting. The State relied upon testimony from the co-defendants and Woodall, as well as the testimony of police officers regarding the Petitioner's statement. Arguing the lack of physical evidence would not have rebutted the testimony of these witnesses. The Petitioner is not entitled to relief regarding this issue.

### 7. Failure to Address Allegations of Gang Membership

The Petitioner submits that trial counsel failed to explain to the jury the Petitioner's relationship to gangs. Specifically, the Petitioner complains that trial counsel failed to present the testimony of Chaplain Nelson, to cross-examine Sergeant Dwight Woods on the Petitioner's statement that he was an "inactive" gang member, and to explain his actual relationship to gangs.

Trial counsel did attempt to present the testimony of Chaplain Nelson, and the trial court ruled this evidence inadmissible. With regard to Sergeant Woods, the sergeant testified during direct examination at trial that the Petitioner stated he was a member of the Gangster Disciples. During a bench conference before Counsel's cross-examination of Sergeant Woods, Counsel obtained clarification from the trial court that the Petitioner's admission as a gang member was an oral statement separate from his formal statements. The Petitioner said he was an "inactive" member of the Gangster Disciples in his statement to police about the Bush shooting. Counsel, however, avoided utilizing the Petitioner's statement about the Bush robbery to cross-examine Sergeant Woods. Although the Petitioner denied shooting Bush, he admitted to participating in the robbery "to look good to my superiors." Accordingly, Counsel was not deficient in his cross-examination of Sergeant Woods. Further, Counsel did attempt to show that the Petitioner was no longer affiliated with a gang but much of this evidence was ruled inadmissible by the trial court. We conclude Counsel

was not deficient in this regard.

### 8. Failure to Cross-Examine Jordan's Counsel

The Petitioner makes a one-sentence argument that "[t]rial counsel failed to conduct any cross examination of Paula Skahan, who was co-defendant Jordan's defense attorney, on discussions and understandings between Jordan and the prosecution relating to Jordan's decision to testify on behalf of the State." Skahan testified at trial that Jordan was not offered a deal in exchange for his testimony. Likewise, in the post-conviction proceedings, Skahan testified that the State did not make an offer to Jordan in exchange for this testimony. She said that, by testifying, Jordan exposed himself to the maximum sentence. She also said that while she hoped that Jordan would receive a more favorable result if he testified, no such result was guaranteed. In our view, the Petitioner was not prejudiced by Counsel's decision to refrain from cross-examining Skahan. Accordingly, the Petitioner is not entitled to relief.

### 9. Failure to Object to Improper Closing Argument

The Petitioner avers trial counsel failed to object to or rebut the prosecutor's improper closing argument. Closing arguments are a "valuable privilege" and should not be unduly restricted. *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001). "Consequently, attorneys are given greater leeway in arguing their positions before the jury, and the trial court has significant discretion in controlling these arguments, to be reversed only upon an abuse of that discretion." *Id.* We have explained that "arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003). The generally recognized areas of prosecutorial misconduct in closing arguments occur when the prosecutor intentionally misstates the evidence or misleads the jury on the inferences it may draw from the evidence; expresses his or her personal opinion on the evidence of the defendant's guilt; uses arguments calculated to inflame the passions or prejudices of the jury; diverts the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making predictions on the consequences of the jury's verdict; and intentionally refers to or argues facts outside the record, other than those that are matters of common public knowledge. *Id.* at 6.

The Petitioner avers that the prosecutor improperly argued that he admitted to the intent to commit a carjacking. During rebuttal closing arguments, the prosecutor stated:

> [The Petitioner] tells you that he's just an innocent bystander. He's an innocent member of the Gangster Disciples riding in the back seat of a car when two of his Gangster Disciples brothers looks up and says, let's go

commit a sting.  Let's go take care of some business.

Well, the police ask him, well, what did you understand when he said let's go take care of some business?  You know, steal a car.  Pop a car. Something like that.

Let's all commit a robbery.  Let's all commit a carjacking.  Let's go out and commit a robbery.  Even if you want to believe absolutely everything that he says, he told you that he entered into a plan with his Gangster Disciples brethren to go out and carjack someone.  To go out and commit a robbery.

According to the Petitioner, he told the police that he expected to "pop" cars, which is not the same as carjacking and does not involve confrontation with the victim.  We conclude the prosecutor's argument characterizing "popping" cars as carjacking could be reasonably inferred from the evidence presented at trial.

The Petitioner also claims that the following statements from the prosecutor during rebuttal closing argument were improper:

Sergeant Woods, Mr. Terrell, Mr. Carmichael, they all told you that when [the Petitioner] committed this act, this crime, this horrible, this unconscionable killing, that he showed no emotion, showed no remorse.  Some of them described him as having a smirk or a silly little grin on his face.

It's time to wipe that silly grin off James Stout's face.  It's time to wipe that smirk off his face.

At trial, Sergeant Woods testified that the Petitioner "didn't show no [sic] emotions either way.  And he just talked about what happened."  The police officer further testified the Petitioner "just sat there and, you know, and just talking like I'm talking to you all.  You know, like it wasn't no big deal, you know, He [sic]–at one point, he was smiling about it, you know."  Terrell also testified that after the Petitioner shot Hunter, he had "this odd grin on his face."  Thus, the prosecutor was restating the evidence and making an argument based on that evidence.  Even if the prosecutor's statements constituted an improper argument to which trial counsel should have objected, we cannot conclude the argument likely influenced the jury's verdict.

### 10.  Failure to Seek Mistrial Due to Juror's Comment

The Petitioner faults trial counsel for failing to seek a mistrial when a juror passed a

note to the trial judge prior to deliberations that stated, "I would like to know have [sic] he changed his life to Christ or how is his behavior in prison?" According to the Petitioner, the juror's statement indicated she was biased and had formed an opinion of guilt prior to deliberations.

While the trial court was instructing the jury prior to deliberations, a juror wrote down a question and passed it to the judge. The judge did not read the question aloud. Rather, the trial judge responded:

Well, Ms. Johnson, your request, the only response I can make to this question is that your verdict must be based solely, only on the proof that you have heard in this case, and the law that I have read to you.

And a verdict cannot be based on anything that goes beyond what you've heard in this courtroom last week, and the argument and charge you heard today.

So having said that, and to reenforce my statement, I will reread two paragraphs from the charge.

The law makes it the duty of the Court to give in charge to the jury the law relative to the case on trial, and the duty of the jury to carefully consider all of the evidence delivered to them on the trial and under the law given them by the Court render their verdict with absolute impartiality.

The jury are the sole judges of the facts and of the law as it applies to the facts in this case.

In making up your verdict, you are to consider the law in connection with the facts, but the Court is the proper source from which you are to get the law.

In other words, you are the judges of the law as well as the facts under my direction. The Court–the jury in no case should have any sympathy or prejudice or allow anything but the law that I read you and the evidence that you've heard in court to have any influence upon them in determining their verdict.

They should render their verdict with absolute fairness and impartiality as they think truth and justice dictate.

Every fact and circumstance in the case you may consider in arriving at your verdict.

The jury is presumed to follow the trial court's instructions. *State v. Young*, 196 S.W.3d 85, 111 (Tenn. 2006). The Petitioner has failed to present facts establishing that trial counsel were deficient in failing to seek a mistrial based on the juror's question or the trial court's response. The Petitioner is not entitled to relief on this issue.

### 11. Failure to Conduct Adequate Voir Dire

The Petitioner maintains that trial counsel's voir dire was inadequate. He submits that trial counsel failed to: (1) object to the prosecution's actions in pressing upon jurors that they had a duty to impose the death penalty; (2) "life qualify" prospective jurors; (3) make any effort to rehabilitate life prone jurors; and (4) challenge "automatic death penalty" jurors. These issues relate to the penalty phase during which the Petitioner was sentenced to death. Because the post-conviction court granted the Petitioner a new sentencing hearing, these issues are moot.

The Petitioner also maintains that the failure to "life qualify" jurors resulted in prejudice during the guilt phase of the trial because "non-life-qualified jurors are more prone to convict." The Petitioner has failed to submit any evidence or cite to any authority supporting his position. He is not entitled to relief on this issue.

### B. Conflict of Interest

The Petitioner maintains Counsel had a conflict of interest based upon his prior representation of Tony Carruthers, a potential defense witness, that was either non-waivable or not effectively waived. The State characterizes the Petitioner's claim as a free-standing claim, which the State maintains is not an abridgement of a constitutional right and is, therefore, waived. The Petitioner, however, argues that the conflict adversely affected Counsel's performance, in violation of his right to effective assistance of counsel. Accordingly, we will analyze the issue as a claim of ineffective assistance of counsel.

Prejudice is presumed in cases in which a petitioner can establish that trial counsel "'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected [counsel's] performance.'" *Strickland*, 466 U.S. at 692 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980)). "[A]n actual conflict of interest includes any circumstances in which an attorney cannot exercise his or her independent professional judgment free from compromising interests and loyalties." *State v. White*, 114 S.W.3d 469, 476 (Tenn. 2003) (citations omitted). "The proper focus is solely upon whether counsel's conflict affected

counsel's actions." *Netters v. State*, 957 S.W.2d 844, 848 (Tenn. Crim. App. 1997).

The Petitioner failed to adduce any proof at the evidentiary hearing to support his claim that Counsel was burdened by an actual conflict of interest. Counsel revealed to the Petitioner in writing his previous representation of Carruthers and subsequent withdrawal due to Carruthers's threats against counsel. Nothing in the record suggests Counsel's representation of the Petitioner was adversely affected by his previous representation of Carruthers. Carruthers did not testify at the post-conviction hearing. As a result, we are unable to determine what Carruthers's testimony would have been and whether it would have benefitted the Petitioner's case. The Petitioner is not entitled to relief with regard to this issue.

### C. Prosecutorial Misconduct

The Petitioner contends that the State committed prosecutorial misconduct in: (1) falsely representing to the trial court prior to trial that Jordan had never previously indicated a desire to talk to the prosecution about testifying and (2) failing to preserve a bullet recovered from Walter Bush. With regard to the first issue, the Petitioner avers that the prosecutor's false representation violated his due process rights. The Petitioner, however, fails to include any argument in his brief as to how the alleged false representation denied him due process. Therefore, this issue is waived. *See* Tenn. Ct. Crim. App. Rule 10(b).

The Petitioner has also waived his second claim of prosecutorial misconduct for failing to cite to the record. *See id.* Furthermore, the record does not support the Petitioner's claim. He is not entitled to relief regarding this issue.

### D. Jury Misconduct

The Petitioner submits his constitutional right to a fair and impartial jury was violated when a juror read aloud the "eye for an eye" passage from the Bible during deliberations. The State counters that the Petitioner waived this issue by failing to raise it in his initial or amended post-conviction relief petition. We agree with the State.

The Petitioner raised the issue for the first time in a "Statement of Claims and Bill of Particulars" filed more than six years after the first amended petition was filed and approximately two weeks before the evidentiary hearing was held. At the evidentiary hearing, the State objected to the testimony of Juror Hugh Graham. The State argued that any issue regarding juror misconduct was waived because the Petitioner failed to raise it in his original or amended post-conviction relief petition. The post-conviction court deferred a ruling on the objection and allowed the Petitioner to question Graham. In its written order,

the post-conviction court sustained the State's objection, finding that the issue was not properly before the court because it was not pled in the amended petition. The post-conviction court also found the Petitioner's attempt to amend the petition to include the issue by oral motion at the evidentiary hearing was too late.

The post-conviction hearing is limited to issues raised in the petition. Tenn. Sup. Ct. R. 28, § 8(D)(4). If a party objects to evidence relating to an issue that was not raised in the petition or answer, the post-conviction court "may allow amendments and shall do so freely when the presentation of the cause will otherwise be subserved. The court shall liberally allow a continuance in the event an amendment is allowed to enable the objecting party to meet the evidence." Tenn. Sup. Ct. R. § (D)(5); *see Smith v. State*, 357 S.W.3d 322, 358 n.6 (Tenn. 2011) (noting that the post-conviction court has "discretion to allow free amendment of post-conviction petitions").

When the Petitioner filed a statement of claim on October 14, 2010, raising the issue of juror misconduct for the first time, the amended post-conviction relief petition had been pending since August of 2002, and the "First Amended Petition for Post-Conviction Relief" had been pending since March of 2003. The statement, which was approximately twenty-five pages long, was not filed until approximately two weeks before the evidentiary hearing. The evidentiary hearing spanned five days, and the Petitioner did not seek to introduce the testimony of Graham until the last day of the hearing. Based upon this time frame and the Petitioner's delay in raising the issue, we conclude that the post-conviction court properly exercised its discretion in denying the amendment. Accordingly, this issue is waived.

### E. Cumulative Error

The Petitioner asserts his trial counsels' performance was constitutionally deficient based upon the cumulative effect of the errors. We conclude the Petitioner's counsel were not ineffective based upon the cumulative effect of errors. The Petitioner is not entitled to relief on this issue.

### III. Conclusion

For the foregoing reasons, we conclude that the Petitioner is not entitled to post-conviction relief with regard to the guilt phase of the trial and for his sentences for especially aggravated kidnapping and especially aggravated robbery. Accordingly, we affirm the judgment of the post-conviction court's order denying the Petitioner post-conviction relief with regard to the guilt phase and those two sentences.

_____
ROBERT W. WEDEMEYER, JUDGE